## Salem
## FREDERICK LYNWOOD FOLEY
## v.
## COMMONWEALTH OF VIRGINIA
No. 0639-87-3
Decided May 2, 1989

COUNSEL

Ebb H. Williams, III and W. Roscoe Reynolds, for appellant.

Robert Q. Harris, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appllee.

OPINION

**KOONTZ, C.J.**—Frederick Lynwood Foley, appellant, was indicted for murder, arson and the use of a firearm in the commission of a felony. A jury found Foley guilty on all three charges. Foley's motion to set aside the verdict and his motion for a new trial were both denied. Foley raises four issues on appeal: (1) whether the trial court erred in refusing to excuse juror Hazel Allen for cause; (2) whether the trial court erred by admitting into evidence the hearsay testimony of the victim's mother; (3) whether the trial court erred by allowing the Commonwealth to recall the victim's mother at the conclusion of the defense's case; and (4) whether the trial court erred by refusing to grant appellant's motion for a new trial based on after-discovered evidence. We hold that it was error for the trial court to fail to excuse the juror for cause. Because we reverse on that ground, we do not decide whether the trial court erred by refusing to grant a new trial based on a claim of after-discovered evidence. We further hold that the trial court did not err by admitting the challenged hearsay testimony, and did not err by allowing the Commonwealth to call a rebuttal witness.

On Saturday, November 30, 1985, at 5:50 p.m., Ok Soon Foley, appellant's wife, telephoned her mother, Myung Chan Park, from the K-Wig Mart which Mrs. Foley owned and operated in Martinsville, Virginia. Mrs. Foley told her mother that appellant

had unexpectantly come home a day early from his stay at the Veterans Administration Hospital in Salem, Virginia where he was being treated for alcoholism. Mrs. Foley told Mrs. Park that they would be home soon and asked her to prepare dinner for them.

At 7:24 that evening the Martinsville Fire Department received a call that the K-Wig was on fire. Upon arrival the fire department discovered the charred remains of Mrs. Foley. Laboratory analysis revealed that the body and surrounding floor had been soaked in gasoline and set on fire. A preliminary autopsy report revealed two bullet wounds in the body, a fatal wound to the chest, and a wound in the hip. This information was released and reported in a December 4, 1985 article in the *Martinsville Bulletin*. The official autopsy report, which was not released until March, 1986, stated that Mrs. Foley was shot only once, and that was in the chest.

Carolyn Marie Scott, who lived with Foley's brother, testified that on December 5, 1985, she obtained a copy of the *Martinsville Bulletin* at work and brought it home with her. The headline read "Store Owner Shot Twice, Body Burnt." While visiting his brother and Scott, Foley saw the article and stated that the newspaper had made a mistake because he only shot his wife once, in the chest. He related that they had argued, that he shot his wife, went to his truck and got the gas, poured it on her and the floor, and set it on fire. He also told them that the only thing he was worried about was the phone call Mrs. Foley made to her mother telling her that he was in the shop. Scott further testified that Foley had told her on several prior occasions that "he had to get rid of the bitch." Scott stated that she had not heard about the phone conversation or the bullet wounds from anyone other than Foley.

Dorothy Knoell, who was at Scott's home that same evening, testified that Foley said, "[S]he's dead and she's gone, I did it." Knoell stated that she became upset, left the room and did not hear any further conversation.

Winston Merchant, who was Foley's cellmate while he was incarcerated in the Martinsville City Jail pending trial, testified that although he did not know Foley prior to this, Foley confided the entire story to him. Foley told Merchant that he went to the wig

shop and shot his wife because she was having an affair with Ray Wilson. Foley also told him about the phone call Mrs. Foley made to her mother and how he was worried about that. He described in great detail how he set the fire with a triggering device involving a Pall Mall cigarette which gave him enough time to get to the Country Inn fourteen miles up the road. At the trial, a videotape reconstructing the crime using a triggering device like the one described by Merchant was shown to the jury; as reconstructed, it took eleven minutes, nineteen seconds for the fire to start.

Foley testified on his own behalf and denied murdering his wife. He stated that he checked into the Country Inn sometime after 4:30 p.m. that Saturday, and that he called his wife from there sometime before 6:00 p.m. He denied going to the shop and being there at the time his wife phoned her mother. However, a clerk from the Inn testified that Foley did not check in until after 6:45 p.m., and that Foley appeared nervous and worried.

During *voir dire*, Foley moved to have juror Hazel Allen struck for cause. Allen indicated that she had read some press reports concerning the crimes for which Foley was charged, and that she had formed an opinion (which she would not express) concerning the guilt or innocence of Foley. After further questioning by counsel and the trial court, the court refused to strike Allen for cause.

After the trial, Foley made a motion for a new trial based on newly discovered evidence, which, if heard at the trial, would have contradicted the testimony of Scott and Knoell. The court denied the motion after finding that the witness Foley sought to rely on for this new evidence was available at the time of the trial, had been subpoened by the Commonwealth, and Foley had made no effort to talk to him prior to the trial. Furthermore, the court concluded that the evidence was cumulative and not likely to produce a different result at a retrial because the witness was not credible, as he had changed his testimony several times in the past.

## I.  The Juror Issue

In his first assignment of error, Foley argues that the trial court erred by failing to exclude juror Hazel Allen for cause. The right to be tried before an impartial jury is firmly embedded in our system of jurisprudence. *See* U.S. Const. amend. VI, Va. Const. art. I, § 8; Code § 8.01-358; *see also Briley v. Common-*

*wealth*, 222 Va. 180, 279 S.E.2d 151 (1981); *Martin v. Commonwealth*, 221 Va. 436, 271 S.E.2d 123 (1980); *Justus v. Commonwealth*, 220 Va. 971, 266 S.E.2d 87 (1980); *Wilson v. Commonwealth*, 2 Va. App. 134, 342 S.E.2d 65 (1986). However, this basic constitutional guarantee does not necessarily preclude those who have formed an opinion based on what they have read and heard in news accounts from serving as jurors. *Reynolds v. United States*, 98 U.S. 145 (1878).

> In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among the best fitted for jurors who has not read or heard of it, and who has not formed some impression or some opinion in respect to its merits.

*Id.* at 155-56.

■ Although preconceived opinions will not automatically disqualify a venireman, the court, during *voir dire*, must be satisfied that the venireman can hear the case and consider only the evidence disclosed at trial as the basis of his verdict. Whether a juror is capable of laying aside a preconceived opinion and rendering "a verdict solely on the evidence is a mixed question of law and fact," the answer to which lies "within the sound discretion of the trial court." *Calhoun v. Commonwealth*, 226 Va. 256, 258, 307 S.E.2d 896, 898 (1983) (citations omitted). The trial court's finding is entitled to great weight and will not be disturbed on appeal absent manifest error. *Id.*; *see also Mullis v. Commonwealth*, 3 Va. App. 564, 351 S.E.2d 919 (1987); *Wilson v. Commonwealth*, 2 Va. App. 134, 342 S.E.2d 65 (1986). In determining whether manifest error exists, a juror's "statements reflecting some preconceived opinion of guilt 'must be read in context with the entire transcript of the *voir dire*.' " *Calhoun*, 226 Va. at 258, 307 S.E.2d at 898 (quoting *L. E. Briley v. Commonwealth*, 222 Va. 180, 182, 279 S.E.2d 151, 152 (1981)); *see also Mullis*, 3 Va. App. at 570, 351 S.E.2d at 923. Further, the proof that a juror is impartial must emanate from the juror.

> [T]he true test of impartiality lies in the mental attitude of the proposed juror, and the proof that he is impartial and

fair should come from him uninfluenced by persuasion or co-
ercion by any one, least of all by the trial judge, who is
charged with the duty of remaining impartial himself, and
seeing that the panel is composed of impartial and unbiased
men.

*Bausell v. Commonwealth*, 165 Va. 669, 682-83, 181 S.E. 453,
458, (1935); *see also Parsons v. Commonwealth*, 138 Va. 764,
773, 121 S.E. 68, 70 (1924); *Educational Books, Inc. v. Common-
wealth*, 3 Va. App. 384, 389, 349 S.E.2d 903, 907 (1986).

In this case, when asked whether what she had read or heard in
news reports had caused her to have any preconceived ideas about
Foley's guilt or innocence, Allen responded, "Somewhat, I mean,
you know, a body kind of makes up their mind after you read
certain things." Although Allen admitted that she had formed an
opinion about the case, she stated that she could remain impartial,
and that she would have to hear all the facts before making a final
decision. Thus, unlike the juror in *Educational Books, Inc. v.
Commonwealth* where the juror unequivocally stated that she had
a "great prejudice" against the defendant, Allen's preconceived
opinion was not so fixed as to amount to a "great prejudice"
against Foley. Consequently, in this context that case is not con-
trolling as Foley suggests.

Because Allen had an opinion about the case, the issue on ap-
peal is whether the indication that she could be impartial and base
her decision on only the evidence presented at trial reflected her
true mental attitude or rather was the product of persuasion re-
sulting from the questions posed to her by the trial court. In order
to more fully understand the resolution of this issue, we quote the
relevant portions of the *voir dire* proceedings.

By counsel:
Q: Have either of you three jurors read anything about
Fred Foley or about the charge standing against Mr.
Foley or have you heard from any source or any discus-
sion any information about this charge against Mr. Fred
Foley?
A: I've read some of it.
Q: I can ask the question then to these other jurors, has
what you have read in the newspaper or what you have
heard discussed about this case, has it caused you to

have any preconceived ideas about the guilt or innocence of the defendant in this charge?

A: Somewhat, I mean, you know, a body kind of makes up their mind after you read certain things.

Q: Would you agree with me that there's been a tremendous amount of information about Fred Foley and about this case in the Martinsville Bulletin?

A: Yes.

Q: And, you're saying to me that there's doubt in your mind as to whether you could sit there impartially as a juror in this case?

A: It's possible but not likely.

The court:

Q: Well, I would say, Ms. Allen, what I want to get understood from you is that you can sit in the Jury Box and that you can hear the evidence that is being presented to you and that you can decide this case on that evidence and not something that you may have heard or read in the newspaper. Can you be impartial?

A: Yes sir.

Q: All right.

By counsel:

Q: May I ask what you meant to say? I understood you to say you did have a preconceived idea that the defendant was probably guilty based on information you read in the newspaper. Am I saying that correctly?

A: What I'm saying is — no. Just in my own mind I'm thinking one way and —

Q: And what is that?

A: I can't say that right now but I'll have to hear all the facts and stuff like that. I am just going on what I read in the paper. I drew my own conclusion, I think most people do in cases.

Q: Am I understanding you to say that to go one way, are you talking about guilt or innocence?

A: Right, but if I went to the Jury I would not go to the Jury with that on my mind. I would have to hear all the facts, then make my decision. This is just what I'm guessing.

Q: Yes Ma'am, but I understood you to say you did have a notion now to go one way.

The court:

She said the interpretation of the articles, she indicates she feels that he's guilty. She also says that she can erase that from her mind and that she can take the Jury Box and that she can be impartial and that won't influence her, is that right?

A: (Allen) Right, because I can't make that hard core decision until I have heard everything.

Q: What we are trying to get at is whether you have any preconceived notions or anything that would prejudice you at this point that you would go in this thinking that he was guilty. Other words, want you have (sic) a clear mind at this point and that you can hear both sides and that you can make your decision on the evidence that you hear and not on anything that you know at this time.

A: That is what I would do.

Q: All right.

By counsel:

Q: Let me ask you this, Ma'am. You indicated and correct me if I'm wrong about this please, I don't mean to be misstating in any way. Did you indicate in response to the question that the information that you had read from the newspaper had caused you to have a conclusion now that the defendant was either guilty or innocent of this charge and that you had already decided, based on that information one way.

A: Within my own self.

Q: And what way would that way be?

A: Do I have to say whether its guilty or not guilty?

The court:

Well, I think we've been over this thing once or twice, Mr. Reynolds. I think your question was unfair to start with in that you asked how they conceive what was in the paper and she says, if I understood her, it pointed toward guilt, what she read in the paper.

A: (Counsel) I didn't hear her say that.

A: (Allen) I didn't say actually guilt, but I've got my own opinion of how I feel but that doesn't count, on what I have read in the paper. That is not being fair because that's not all the facts, that's the reason within my own self I'm not saying whether he's guilty or not guilty according to what I read, but if I was going in the Jury

Room I would want to hear everything, keep an open mind about it, like I had not heard or read anything, that would be the only fair way to be.

Q. That is what we want. We want you to be completely impartial, now that you haven't been prejudiced by anything that you heard or that you may have read.

A: That's the reason I said possible but not likely. That's the only way I can — and I do not believe in capital punishment verdict. I have always said that.

The court:

This is not a capital case.

A: All right, sir.

The court:

The most he can get in this case is life and then it goes on down the descending scale. First of all you have to decide whether he's guilty or innocent and then if you find him innocent you don't have to go any further and if you find that he's guilty then you can go up to life in prison.

By counsel:

Q: Judge, would it be all right if I ask this lady another question with regard to what I think her last response was?

A: All right.

Q: Ma'am, if I understood you correctly you're indicating that you have received information about this case that you can sit on that Jury and you can decide the guilt or innocence of the defendant in this case based solely on the evidence that will be offered by the Commonwealth and by the defendant.

A: Yes.

Q: And that you would exclude from your mind and your consideration anything that you have read in the newspaper or heard from any other source about the defendant or about the evidence in this case, is that correct?

A: Yes, I could.

In *Parsons*, two veniremen stated on *voir dire* that they had formed an opinion as to the guilt or innocence of the accused based on newspaper accounts of the case. During *voir dire* by

counsel, both stated that their opinion was not so fixed that other evidence could not persuade them differently. The court interjected and the following conversation between the trial judge and one of the veniremen ensued:

Q: Then do you feel, Mr. Hurt, . . . that you can enter upon this service as a juror in this most important case and disregard the opinion that you have formed, but let your deliberations and your actions hinge and depend upon the evidence that you hear on the stand?

A: Yes, sir; I feel that I could.

Q: You feel that you could give the prisoner a fair and impartial trial, notwithstanding the opinion you have formed?

A: Yes, sir.

A similar conversation ensued with the other venireman in question. The Court held that the veniremen were not impartial because the otherwise qualifying statements made by the veniremen "did not emanate from [them], but were suggested by the leading, argumentative, and persuasive questions which were addressed to [them]. All that [they] did was to assent thereto." 138 Va. at 773, 121 S.E. at 70. The Court went on to emphasize that while this type of questioning would not constitute reversible error in every case, given the nature of the crime the defendant was charged with, first degree murder, together with the fact that it was a much publicized case which had aroused local interest, it was crucial for the court to make a greater effort to obtain jurors free from bias.

Similarly, although Allen reiterated her ability to be impartial, the proof of her impartiality did not emanate from herself. We do not suggest that in this case the court's questions were argumentative. However, much like the answers given by the veniremen in *Parsons*, the answers given by Allen were the product of leading questions posed to her by the court in such a manner as to suggest and influence her answers. Allen's opinion was not one rooted in a religious belief or strong moral conviction concerning an issue presented by the trial. Such an opinion is not likely to be abandoned or altered merely by questions suggesting that a prospective juror do so. In contrast, for a prospective juror to be willing to remain perceived as biased or not "impartial" involves a more del-

icate balance between maintaining one's opinion and simply responding in the desired manner to questions which suggest a particular answer. We believe this is particularly true when such questions come from the court. We recognize that the trial judge has the right, and moreover the duty, to ask appropriate questions to clarify any ambiguity in a prospective juror's answers to questions by counsel concerning his or her impartiality, and that this process is not amenable to hard and fast rules. However, in this case, having expressed that she had formed an opinion in response to the general questions of counsel, and knowing that this had compelled the court to question her further in that regard, could only suggest to Allen that the answer desired from her was that she would nevertheless be "impartial." Consequently, the proof of her impartiality did not "come from [her] uninfluenced by persuasion or coercion . . . ." *Bausell*, 165 Va. at 683, 181 S.E.2d at 458. A full reading of the *voir dire* proceedings of juror Allen persuades us that her responses amounted to "mere assent to persuasive suggestions." *Id.* at 676, 181 S.E.2d at 455.

Like the defendant in *Parsons*, Foley was charged with first degree murder. The case received much publicity in the local media. Given the serious nature of the crime charged and the publicity given to it in the local media, it was incumbent upon the trial court to make every effort to insure that Foley was tried by an impartial jury. When asked if there was doubt in her mind whether she could sit impartially as a juror, Allen responded, "It's possible but not likely." While it is unclear from the record whether Allen meant to say that it was possible but not likely that she could be impartial or whether she meant it was possible she was prejudiced but not likely, all "doubts as to the impartiality of a juror must be resolved in favor of the accused." *Educational Books*, 3 Va. App. at 387, 349 S.E.2d at 906. For these reasons, we hold that the trial court abused its discretion and committed manifest error by refusing to strike Hazel Allen for cause.

## II.   The Hearsay Evidence

Over Foley's objection, Mrs. Foley's mother was allowed to testify that during a phone conversation with Mrs. Foley at 5:50 p.m. on the day of her death, Mrs. Foley stated that "Freddie" was with her at the shop. Both the Commonwealth and Foley agree that this testimony was hearsay. Thus, the issue on appeal,

which we address because it likely will recur on retrial, is whether an exception to the hearsay rule applies to this testimony.

Because the Commonwealth sought to have the hearsay testimony admitted into evidence, it "had the burden of showing that the declaration fell within an exception to the rule against hearsay." *Arnold v. Commonwealth*, 4 Va. App. 275, 281, 356 S.E.2d 847, 851 (1987)(citing *Doe v. Thomas*, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984). The Commonwealth argued that the "present sense impression" exception, which is a sub-rule of the *res gestae* exception to the hearsay rule, applied. That rule states that "[w]hen any act done by any person is a fact in issue, or is relevant to the issue, the following . . . are relevant . . . *all statements made by or to that person accompanying and explaining such act.*" C. Friend, *The Law of Evidence in Virginia* § 240 (2d ed. 1983)(emphasis in original). Three factors must exist in order for the exception to apply. They are: (1) the declaration must have been contemporaneous with the act; (2) it must explain the act; and (3) it must be spontaneous. *Id.* While Virginia is among the majority of states that recognize the present sense impression exception,[1] there are no Virginia cases which address the precise issue presented in this appeal. Consequently we look to our sister states for guidance.

In *Booth v. State*, 306 Md. 313, 508 A.2d 976 (1986), the state proffered the evidence of a witness who testified as to the contents of a phone conversation she had with the victim before his death which placed the defendant at the scene of the crime. The trial court allowed the testimony under the present sense impression exception, and the Maryland Court of Appeals affirmed, stating that "the 'present sense impression' exception to the hearsay rule rests upon a firm foundation of trustworthiness, and we adopt it in the form in which it appears at Fed. R. Evid. 803(1)." *Booth*, 306 Md. at 324, 508 A.2d at 981. Such statements are considered trustworthy because, since the statement is made contemporaneous with the event being described, there is neither a memory problem nor time for a calculated misstatement. "The trustworthiness of the assertion arises from its timing. The requirement of contemporaneousness, or near contemporaneousness,

---

[1] *See Booth v. State*, 306 Md.313, ____, 508 A.2d 976, 979 (1986), for recitation of 28 states that recognize the exception in their codified evidence codes. Most are patterned after Fed. R. Evid. 803(1).

reduces the chance of premeditated prevarication or loss of memory." *Id.* at 323, 508 A.2d at 980 (quoting D. Binder, *Hearsay Handbook* 89 (2d ed. 1983, Cum. Supp. 1985)); *see also Brown v. Tard,* 552 F. Supp. 1341 (D.N.J. 1982). In *Booth,* the court quoted Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229, 236 (1922) as follows:

A statement by a person as to external events then and there being perceived by his senses is worthy of credence for two reasons. First, it is in essence a declaration of a presently existing state of mind, for it is nothing more than an assertion of his presently existing sense impressions. As such it has the quality of spontaniety . . . . Second, since the statement is contemporaneous with the event, it is made at the place of the event. Consequently, the event is open to perception by the person to whom the declaration is made and by whom it is usually reported on the witness stand. The witness is subject to cross-examination concerning that event as well as the fact and content of the utterance, so that the extra-judicial statement does not depend solely upon the credit of the declarant.

306 Md. at 319-20, 508 A.2d at 979.

The court further stated that the underlying guarantee of reliability and trustworthiness of the admitted testimony is sufficient and corroborating evidence is not necessary. Although "extrinsic evidence may sometimes be required to demonstrate the contemporaneity of the statement, or to show that it is the product of personal perception by the declarant," it is not required in order for the declarations to be admissible. *Id.* at 330, 508 A.2d at 984. However, "[e]ven when not required for admissibility, corroboration (or the lack thereof) may be important in determining the weight to be given the statement." *Id.*

Likewise, the Supreme Court of Iowa recognized the present sense exception to the hearsay rule in *State v. Flesher,* 286 N.W.2d 215 (Iowa 1979). In *Flesher,* the victim's husband was allowed to testify over objection that he was talking to his wife on the telephone when there was a knock at her door. The victim answered the door, came back to the phone and told her husband that it was the defendant and that she had let the defendant in. The Court admitted the testimony under the present sense impres-

sion exception. The Court reasoned that like the excited utterance exception to the hearsay rule, "the circumstances surrounding the declaration minimize the motive or opportunity to fabricate." *Id.* at 217. Like the Court in *Booth*, the Iowa Supreme Court held that although admissibility of the evidence is not conditioned upon corroboration, it will affect the weight given the statement. *Id.* at 218.

In this case, the Commonwealth proffered the testimony of Myung Chan Park, Mrs. Foley's mother, regarding a telephone conversation she had with Mrs. Foley shortly before her death. During the Commonwealth's case-in-chief, Park was allowed to testify through an interpreter that Mrs. Foley told her that "Fred was supposed to come on Sunday but he came, that day was Saturday, and came already so she cooked for them." At the close of Foley's case, the Commonwealth called Park for rebuttal. The following exchange ensued:

Q: Would you ask Mrs. Park, referring back to the telephone conversation that she had with Soon at the shop on November 30, 1985, if Soon described where Freddie was or offered to let her speak to Freddie?

A: She says that Freddie is with me at store. She wants to cook for Freddie and she asks, "Would you like to talk Freddie?" Mrs. Park says, "I cannot speak English," so any way he can see soon, so they just hung up.

Q: Has she at any time ever talked with him on the telephone about the weather or about anything?

A: She said no.

Q: She never discussed things like that with him on the telephone at any time?

A: She said no.

Q: Did Soon normally ask her if she wanted to talk to Freddie?

A: Sometimes, not every time, once in a while she would ask do you want to talk to Freddie?

Q: What would she say to Freddie?

A: She say Freddie would say, "O Ma, how are you," just to say, "I love you," that's all.

We agree with the Commonwealth that this testimony was properly admitted under the present sense impression exception to

the hearsay rule. As previously stated, the exception is recognized in Virginia and evidence will be admitted if the requirements for admittance exist. We believe the factors necessary for admittance existed in this case. Mrs. Park testified that Mrs. Foley said Foley was there and offered to let her speak to him. The declaration made by Mrs. Foley was contemporaneous with the act of phoning her mother. The declaration explained that Foley had returned from the hospital a day early, that he was there with her at the shop, and that they were coming home soon for dinner. It also was spontaneous, as it reflected Mrs. Foley's personal perceptions at that time and was not a narrative reflection of a past event. *Cf. Arnold v. Commonwealth*, 4 Va. App. 275, 356 S.E.2d 847 (1987)(statement lacking spontaniety which amounted to a summation of past events not admissible under present sense impression exception). Like *Booth* and *Flesher*, we believe that there was neither time for reflection nor motive or opportunity for fabrication. In fact, Foley concedes in his brief that Mrs. Foley was not in fear of being harmed when she placed the call. That being true, there would have been no reason for Mrs. Foley to state that Foley was at the shop unless it was true. We believe this testimony was properly admitted since all of the requirements necessary for the exception to apply were satisfied.

■ Additionally, Foley contends that even if the exception does apply, the evidence would still be inadmissible because there was no corroborating evidence which placed Foley at the scene of the crime. In this appeal we need not address the issue of whether corroborating evidence is necessary in order for the exception to apply since there was corroborating evidence. The Commonwealth presented three witnesses who testified that Foley admitted killing his wife. Foley incorrectly asserts that the testimony of these witnesses is insufficient as corroborating evidence since they could be impeached. Witness credibility is an issue for the jury to resolve and is reflected by the weight given the testimony. *Mullis v. Commonwealth*, 3 Va. App. at 571, 351 S.E.2d at 923 (citing *Zirkle v. Commonwealth*, 189 Va. 862, 870, 55 S.E.2d 24, 29 (1949)).

Finally, we reject Foley's contention that the statement was inadmissible because it was unreliable. Foley asserts that it is unclear from Mrs. Park's testimony whether Mrs. Foley meant to say Foley was at the store or whether she meant that he was back in town. However, Foley was given the opportunity to cross-ex-

amine Mrs. Park, and test her recollection of the utterance and clarify it.[2] Whether Mrs. Park's testimony was credible was for the jury to resolve and goes to the weight given the evidence and not its admissibility. *Bridgeman v. Commonwealth*, 3 Va. App. 523, 528, 351 S.E.2d 598, 601-02 (1986)(citing *Sutphin v. Commonwealth*, 1 Va. App. 241, 248, 337 S.E.2d 897, 901 (1985)).

### III. Rebuttal Testimony

Foley's third challenge on appeal is that the trial court abused its discretion by allowing the Commonwealth to recall Mrs. Park as a rebuttal witness at the conclusion of his case. He correctly states the Virginia rule that a trial court in its discretion may allow the Commonwealth to present rebuttal evidence even when it would have been more appropriately introduced as part of the case-in-chief. *Quintana v. Commonwealth*, 224 Va. 127, 142, 295 S.E.2d 643, 650 (1982), *cert. denied*, 460 U.S. 1029 (1983); *see also Hargraves v. Commonwealth*, 219 Va. 604, 248 S.E.2d 814 (1978)(order of proof in a criminal case left to the sound discretion of the trial court); *Armes v. Commonwealth*, 3 Va. App. 189, 194, 349 S.E.2d 150, 153 (1986). However, Foley contends that the trial court abused its discretion in this case because the Commonwealth asked the witness the same questions on rebuttal as it did in its case-in-chief. We disagree. Foley presented evidence that he was not at Mrs. Foley's shop, but rather had telephoned her from an inn before she spoke to her mother. The Commonwealth was entitled to present evidence to rebut this testimony.

For the foregoing reasons, the conviction is reversed and remanded.

*Reversed and remanded.*

Barrow, J., concurred.

Moon, J., dissenting.

---

[2] Foley's contention that the testimony is unreliable because the conversation took place in Korean is without merit. Mrs. Park speaks only Korean. Therefore, it follows that she understood what was said. Further, there was a qualified interpretor at trial, to which no objection was raised by Foley.

I dissent because I cannot find that the trial judge abused his discretion in refusing to strike Mrs. Allen as a juror. As the majority points out, whether a juror is capable of laying aside a preconceived opinion and rendering a verdict lies within the sound discretion of the trial court, and the trial court's finding should not be disturbed on appeal absent manifest error. *Calhoun v. Commonwealth*, 226 Va. 256, 258, 307 S.E.2d 896, 898 (1983). Further, the true test of impartiality lies in the mental attitude of the proposed juror, and the proof that he is impartial and fair should come from him uninfluenced by persuasion or coercion by anyone. *Id.*

In *Parsons v. Commonwealth*, 138 Va. 764, 773, 121 S.E. 68, 70 (1924), relied upon by the majority, both prospective jurors stated that they had formed fixed opinions that the defendant was guilty and each said that he would go into the jury in a frame of mind such that it would take evidence to change his mind. Each essentially only responded "yes" to a series of leading and argumentative questions from the court in its effort to rehabilitate them.

In this instance, I believe the trial judge was in the best position to weigh Mrs. Allen's qualifications to serve. Mrs. Allen revealed that she had some preconceived idea of the defendant's guilt based upon what she read in the newspaper. However, in addition to affirmative responses to non-argumentative questions by the court, she stated in her own words that she could put aside what she had read in the newspaper and decide the case based solely upon the evidence presented at trial. She also responded similarly to a number of leading questions propounded by defense counsel. The record would support a finding that she was a reasonably informed juror who had read something in the newspaper and who admitted that she came away from that reading with the point of view that the defendant was guilty. However, the court could reasonably have found that she could put such feelings aside and try the case solely upon the evidence. I fail to find in this record that Allen had the same fixed opinion of appellant's guilt, or that she had essentially declared that appellant would have to prove his innocence, as had the prospective jurors in *Parsons*. These were among the significant circumstances in *Parsons* that caused the Supreme Court to rule that the trial court abused its discretion in failing to strike the jurors there. Therefore, because, in my opinion, those circumstances do not exist here, I would affirm the conviction.