Salem

RICKY WAYNE BOBLETT

v.

COMMONWEALTH OF VIRGINIA

No. 1339-88-3

Decided August 14, 1990

[redacted]

Counsel

C. David Whaley (Elizabeth D. Scher; Morchower, Luxton and Whaley, on brief), for appellant.

Virginia B. Theisen (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KEENAN, J.**—Ricky W. Boblett was convicted by a jury of attempted murder, conspiracy to commit capital murder, maliciously causing property damage, and possession of an explosive device. He argues that: (1) the trial court abused its discretion in not striking a juror for cause who allegedly was predisposed against the use of an insanity defense; (2) the trial court erred in giving the jury an instruction on intoxication; (3) the trial court erred in limiting the testimony of Boblett's expert witness; and (4) the jury's verdict was contrary to the law and the evidence on the issue of Boblett's sanity at the time of the offenses.

We find no abuse of discretion in the trial court's refusal to strike the disputed juror for cause. We further find that the trial court did not err in instructing the jury on intoxication and did not improperly limit the testimony of Boblett's expert witness. Lastly, we find that the jury's verdict was not contrary to the law and the evidence on the issue of Boblett's sanity at the time of the offenses. Accordingly, we affirm the decision of the trial court.

I.

During voir dire examination of the jury, Boblett moved that three potential jurors be struck for cause, alleging that they were prejudiced against the insanity defense. The trial court agreed that two of the three jurors should be removed from the venire. The first juror was struck for cause based on her belief that the insanity defense was a "cop out." The second juror struck for cause had implied that only if the evidence of insanity were overwhelming could he vote for a verdict of acquittal. Mr. Richards, the potential juror at issue here, was not struck for cause by the trial court. The relevant portions of the voir dire proceeding were as follows:

> JUDGE: If you were satisfied beyond a reasonable doubt that the evidence establishes that Mr. Boblett did the wrongful acts or some of the wrongful acts that he is charged with, but if you were also persuaded by the evidence that he did not understand what the consequences of those wrongful acts would be, which is a shorthand version of the definition of legal insanity, and if you were instructed to that effect and persuaded by the evidence that that was the case, could you

vote for an acquittal?

JUROR: I don't think I believe in insanity.

JUROR: I have a hard time with that.

MR. HAGAN: Your Honor, it occurs to me that we might be mixing up Virginia law with what the jurors might have heard from other jurisdictions. The law in Virginia is that every person is presumed to be sane unless the evidence you hear on the witness stand satisfies you, by a preponderance of that evidence, that you're satisfied that more likely than not that the defendant was criminally insane. And by definition, criminally insane means not to be responsible for your actions. So if it was proven to you by a preponderance of the evidence that Mr. Boblett either plumb didn't know what he was doing, didn't know what he was doing was wrong, or that he just couldn't help what he was doing, and the Judge will tell you the precise terms for that, but if you find that he is not responsible in the terms given you by the court, could you do your duty and acquit him?

JUROR: It depends on what that means. I can't understand that somebody can mentally not be responsible, but acquitting—does that mean set free?

MR. HAGAN: Well you don't concern yourself with that. That's between the Commonwealth —

JUDGE: That is a matter for the court to deal with.

JUROR: Okay.

JUDGE: Mr. Hagan is quite correct.

JUROR: I have a lot of difficulty accepting anything like that. I mean it just doesn't set well with me. I think people should be held responsible for their actions. Sane or insane, they should be treated the same except they might have to have a little more mental care if they're insane. I don't think I can acquit somebody on that.

MR. HAGAN: Let me give you two classic examples in Virginia law. If someone—and this has got nothing to do with this case. It's a made up what if. If someone crushed a human skull and thought it was a glass jar at the time, thought that they were breaking a glass jar and they really hit a human skull, then they would not understand the nature and consequences of their acts and would you vote to acquit because they were not responsible for that act.

JUDGE: Let's rephrase that. Would you vote to find the person not guilty.

MR. HAGAN: Not guilty. Right.

JUROR: Well again there. Can you prove that's what they were thinking. I mean, you can't really, to me, you can't prove that. You can't prove what's going on in somebody else's head.

JUROR: Does not guilty mean they didn't do it because he did do it?

MR. HAGAN: Not guilty means that he's not guilty by reason of insanity means that the defendant did the act but that they are not responsible for the act at law because they are criminally insane.

JUROR: Well I guess if you can prove to me someone is insane—which would be difficult—but if you could, then I think I could maybe understand that.

MR. HAGAN: How difficult would it be?

JUROR: It would be pretty difficult.

MR. HAGAN: It only has to more likely than not.

JUROR: It would have to be pretty difficult.

MR. HAGAN: On a fifty-fifty scale, if you leaned this way towards well maybe he really was crazy, then it would be your duty to find not guilty by reason of insanity. Could you do that?

JUROR: Again, I'll just have to say it would be extremely difficult. I can't say yes or no unless the circumstances were pretty drawn out.

MR. HAGAN: Well we can't judge ahead as to what the circumstances might be.

JUROR: I know. I'm sorry.

MR. HAGAN: If it presents a proper case.

JUROR: I think I can try and give a pretty fair decision but you bring in insanity it might just be very difficult to work with. I don't know.

MR. HAGAN: Do you think you could follow the Judge's instruction when the Judge tells you what the law is, can you follow that law.

JUROR: Yes. I could follow the isntruction [sic].

MR. HAGAN: Okay. Those are all my questions.

JUDGE: Mr. Emick.

MR. EMICK: Is it fair to say that it would take a little bit more than 51 percent of the evidence to convince you that someone was not responsible for their actions.

JUROR: It would have to be pretty heavy.

MR. EMICK: Alright sir.

JUDGE: And would you continue to feel that way even if the court at some point instructed you —

JUROR: Oh I could follow orders. I mean, whether I agree or disagree with the law, I could follow it, in other words I guess is what I'm saying. That I can follow instructions.

JUDGE: Okay.

MR. HAGAN: And I want to make a distinction between when you say it would have to be pretty heavy proof. Do you mean you would have to hear a lot of facts or, if on the facts you heard, you weighed between insane and not insane.

JUROR: I'll listen and try and make a fair decision.

MR. HAGAN: You're entitled to require whatever facts you want to listen to. But if the scales does down toward insanity [sic].

JUROR: Well if it goes down far enough, yes.

MR. HAGAN: Okay.

JUDGE: Thank you. Anything else?

MR. EMICK: No, I don't think so.

The trial court denied Boblett's motion to strike Richards for cause, finding that Richards had candidly expressed an ability to follow instructions and did not have such a "mind set" as to require his removal from the venire.

At trial, the evidence showed that in 1986, Boblett and Lisa Layman became engaged. Layman testified that when she ended the engagement in October, 1987, Boblett told her that he would kill anyone she dated. In November 1987, Boblett told her that he was aware she had been dating other men and that he was going to kill her. In December 1987, Boblett purchased dynamite and blasting caps. On December 24, 1987, he went to Layman's house with Charles Roberts and wired the explosives to her car. The next day, as Layman was driving the car, she heard an explosion in the rear of the vehicle. Following the explosion, she was unable to slow or stop the car. The police later determined that an explosive device had been wired in the area of the brake fluid line and the emergency brake cable had been severed.

Roberts testified that after this incident, Boblett asked him to blow up his car in order to remove suspicion from him concerning the Layman explosion. Roberts refused. Later, Boblett's car was

discovered burned. The police determined that the fire had been deliberately set by the ignition of a rag placed in the gas tank.

The evidence further showed that Boblett, who was a high school teacher, asked a student, Bruce Ferris, to help in hiring someone to murder Layman. Ferris agreed. Boblett also recruited another student, Kevin Lemons, to help him "take care" of someone for him.

Boblett was arrested on January 23, 1988. While in jail, he told inmate Michael Snead that he believed that Layman's testimony would convict him. He then asked Snead whether he knew of anyone who could kill her. Snead said that he did. He then told the Roanoke police about Boblett's request. Acting upon this information, State Police Agent Peters posed as a contract killer, met with Boblett in the jail, and agreed to kill Layman. Boblett then arranged for the delivery of $3,500 in cash to Peters to pay for the killing.

Boblett's evidence at trial focused on his insanity defense based on his use of anabolic steroids. Dr. David Katz testified on Boblett's behalf about the effects of anabolic steroids. He concluded that Boblett suffered from "psycho-active substance induced organic mental disorder, not otherwise specified." He was then asked on direct examination if he had formed an opinion whether Boblett understood the nature, consequences, and character of his actions. The prosecutor objected to this question on the ground that it addressed the legal definition of insanity and, thus, was an ultimate issue to be determined by the jury.

At this point, the trial court removed the jury from the courtroom and heard further argument on the matter. The prosecutor suggested that the question be rephrased in terms of probability. When the jury returned, defense counsel asked Dr. Katz "whether a person that meets your diagnosis might not understand the nature, character, and consequences of his act." Katz answered: "Absolutely." Dr. William Lee, a clinical psychologist associated with Central State Hospital, testified on behalf of the Commonwealth. He testified that while Boblett had a personality disorder called Narcissistic personality type, he did not find evidence of any serious mental illness or defect in Boblett. Dr. Lee further testified that an individual with a Narcissistic personality type characteristically has feelings of self-importance and could take a

destructive path with full knowledge of the consequences.

Dr. Lee also testified that if Boblett systematically abused steroids, he could have suffered diminished capacity and, in "a social judgement context," may not have been able to fully appreciate wrongfulness. Dr. Lee stated that he was aware that Boblett had claimed to have used approximately one gram of cocaine per day to balance the depression he felt from use of the steroids. Finally, Dr. Lee defined intoxication as the introduction into the body of any kind of poisonous substance which affects bodily functions or thinking.

After the conclusion of the evidence, the trial court gave several instructions regarding Boblett's responsibility for his acts. Instruction 25 instructed the jury on the law of voluntary intoxication.[1] Boblett objected to this instruction on the ground that anabolic steroids are not intoxicants. The trial court overruled his objection.

## II.

Boblett first argues that the trial court abused its discretion in refusing to strike prospective juror Richards for cause. He places particular emphasis on the fact that when asked whether it would take more than fifty-one percent of the evidence to convince him that someone was not responsible for his actions, Richards responded: "It would have to be pretty heavy." At this point, however, Richards had not been informed of the legal standard required to prove insanity or asked whether he could apply that standard to the evidence before him.

Whether a juror is capable of laying aside any preconceived opinion and rendering a verdict based solely on the evidence is a matter submitted to the sound discretion of the trial court. *Foley v. Commonwealth*, 8 Va. App. 149, 154, 379 S.E.2d 915, 918, *aff'd en banc*, 9 Va. App. 175, 384 S.E.2d 813 (1989). The decision of the trial court whether to seat a prospective juror is entitled to great weight and will not be disturbed on appeal unless

---

[1] Instruction 25 reads as follows: "Voluntary intoxication is no excuse for crime even though such intoxication may have produced temporary insanity during the existence of which the criminal act was committed. A person cannot voluntarily make himself so intoxicated as to become on that account irresponsible for his conduct during such intoxication. He may be perfectly unconscious of what he does and yet be responsible."

there is manifest error. *Id.*; *Mullis v. Commonwealth*, 3 Va. App. 564, 570, 351 S.E.2d 919, 923 (1987).

The proof that a juror is impartial must emanate from the juror himself. *Educational Books, Inc. v. Commonwealth*, 3 Va. App. 384, 389, 349 S.E.2d 903, 907 (1986). In *Educational Books, Inc.*, a panel of this Court reversed the trial court's refusal to remove a juror for cause where the juror categorically stated that she had "great prejudice" against the defendant. This Court found that the juror's statement to the trial court, considered in the context of her entire voir dire, expressed an unequivocal bias against the defendant. At the conclusion of that voir dire, the trial court had asked: "Well, everyone has preconceived ideas or perhaps prejudices about certain things. The question is: do you feel that you can judge, be judge of the facts and reach a fair and impartial verdict based solely on what you hear in the courtroom?" Although the juror answered "yes" to this leading question, she did not give any explanation of how her feelings of prejudice might impact on her duty as a juror.

In contrast, in the case before us, Richards stated in his own words that he could follow the instructions of the trial court notwithstanding whether he agreed or disagreed with the law. His statement in this regard was spontaneous rather than in response to a question from the trial court or counsel. It demonstrated an understanding of the difference between having an opinion about the law and being able to lay that opinion aside to fairly apply the law to the evidence presented.

The context of Richards' voir dire also contrasts markedly with the voir dire of juror Allen in *Foley v. Commonwealth*, 8 Va. App. 149, 379 S.E.2d 915 (1989). In *Foley*, the trial court had posed a series of questions which led the Court to conclude that "the answers given by Allen were the product of leading questions posed to her by the [trial] court in such a manner as to suggest and influence her answers." *Id.* at 159, 379 S.E.2d at 921. In reaching its conclusion in *Foley*, this Court emphasized the particular difficulty which occurs when the trial court seeks to rehabilitate a juror through the use of complex, leading questions. When this occurs, the reviewing court has no assurance that the juror's answers are the product of his or her own thinking, as opposed to answers which the trial court through its leading questions has suggested would be "correct." We find no such error here. Rather,

the record before us demonstrates that Richards' answers to the trial court were manifestly the product of his own thoughts. The trial court did not place him in a position where he was led to giving only one "correct" response. Instead, counsel and the court asked a series of questions which were followed by Richards' spontaneous statement indicating an ability to follow the law notwithstanding any opinions he may have about it.

■ We review Richards' responses in the context of his entire voir dire. *Briley v. Commonwealth*, 222 Va. 180, 182, 279 S.E.2d 151, 152-53 (1981). Viewed in this framework, we find no abuse of discretion in the trial court's refusal to strike him for cause. Although Richards did initially express an opinion that people should be held responsible for their actions, and further suggested that it would take more than fifty-one percent of the evidence for him to find a defendant insane, these statements were made without his knowledge of the applicable legal standards. Thus, he was asked his opinions on those subjects without having knowledge of what he would be required to do as a juror in this particular case. While we do not suggest that counsel must or should pose voir dire questions in the context of the applicable legal standard, when they are not, answers given by a prospective juror will be made without reference to any standard and, thus, cannot be considered in isolation. Only when reviewed in the context of the complete voir dire of the venireman can a reliable evaluation of the trial court's decision be made.

In examining the overall context of Richards' responses, we find that, while Richards did express a preconceived opinion about the insanity defense, he expressed in his own words an ability to set that preconception aside and follow the instructions of the court, notwithstanding his opinion of the law. The trial court was able to view Richards' demeanor in making this statement as well as his other responses. It concluded that he could follow the court's instructions and that he was not so disposed against the insanity defense as to require that he be struck for cause. We find no manifest error in this ruling. *See Mullis v. Commonwealth*, 3 Va. App. at 570, 351 S.E.2d at 923. Boblett next argues that the trial court erred in instructing the jury on intoxication. He asserts that there was no evidence that ingestion of anabolic steroids produces intoxication or that he was intoxicated at the time of the acts in question. Although Boblett based his insanity defense on his abuse

of anabolic steroids over a period of time, he argues that there was no evidence relating this use of steroids to an intoxicated state. We disagree.

Dr. Lee testified that intoxication results from "the introduction of any kind of poisonous substance into an organism which affects the person's bodily functions or thinking." He further testified that Boblett's condition, based on his own statement that he used steroids and cocaine since October or November of 1987, was "more of a volitional self-induced intoxication than compared, for example, to someone who knew nothing about steroids and was all of a sudden given five pills and took them and became diffused over this."

We find that this testimony supported the trial court's decision to instruct the jury on the effects of intoxication. Dr. Lee's testimony, if accepted by the jury, was sufficient to establish that Boblett's self-described pattern of steroid and cocaine use caused a state of intoxication. Further, since this testimony supported the existence of a continuing state of intoxication, we find that it was sufficient to make the question of Boblett's intoxication at the time of these offenses a jury issue.

Boblett also argues that the trial court erred in limiting the testimony of his expert witness, Dr. Katz. During his direct examination of Dr. Katz, defense counsel attempted to ask the following question: "Did you form an opinion, Doctor, concerning whether or not Mr. Boblett understood the nature of the consequences and the character of his actions?" The prosecutor objected to the question, stating that this was an ultimate issue for the jury's determination. The prosecutor then suggested that the question be restated in terms of the probability whether a person so diagnosed would understand the nature and consequences of his actions. Defense counsel stated that he had no objection to the question being posed in that form. He then asked the witness: "Dr. Katz, based on your diagnosis, can you state to a reasonable degree of medical certainty whether a person that meets your diagnosis might not understand the nature, character, and consequences of his act?"

The record shows that defense counsel did not object to this limitation of Dr. Katz's testimony. Rather, he acquiesced to the suggested rephrasing of the question. Since there was no objection raised at trial to the court's directive that the question be re-

phrased, we do not address the merits of this argument on appeal. Rule 5A:18; *Gardner v. Commonwealth*, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986). The fact that this argument was raised initially in a post-trial motion to set aside the verdict does not alter our decision. In order for an objection to be timely, it must be made when the evidence is offered or the ruling given. *Harward v. Commonwealth*, 5 Va. App. 468, 473, 364 S.E.2d 511, 513 (1988).

■ We turn now to address Boblett's contention that, based on the testimony of Drs. Katz and Lee, legal insanity was established and therefore, the jury's verdict was contrary to the law and the evidence. In reviewing this sufficiency claim, we review the evidence in the light most favorable to the Commonwealth, according it all reasonable inferences fairly deducible therefrom. *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988)(citations omitted). All evidence of the accused which is in conflict with the Commonwealth's evidence must be discarded, and all credible evidence of the Commonwealth must be regarded as true. *Parks v. Commonwealth*, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980), *cert. denied*, 450 U.S. 1029 (1981).

■ It is well settled that a defendant is presumed to be legally sane until he proves to the satisfaction of the trier of fact that he was insane at the time of the offenses for which he is on trial. *Christian v. Commonwealth*, 202 Va. 311, 316, 117 S.E.2d 72, 75 (1960). We construe the term "to the satisfaction of the jury" to mean proof by a preponderance of the evidence. *See id.* In the case before us, the evidence was in conflict on the issue of Boblett's sanity. Dr. Katz testified that Boblett had a psychoactive substance induced organic mental disorder which might cause an inability to appreciate the nature, character and consequences of his conduct. Dr. Lee, however, testified that it was his opinion that Boblett did not suffer from a mental disease or defect. Instead, he diagnosed Boblett as having a personality disorder called Narcissistic personality type. He further testified that someone with this personality type commonly engages in destructive conduct with full knowledge of the consequences of his acts. Dr. Lee also testified that an individual's use of extreme doses of steroids could cause paranoid and delusional actions. However, he qualified this statement with regard to Boblett, emphasizing that he did not have any detailed estimate of Boblett's actual dosages.

We find that the above testimony of Drs. Katz and Lee was conflicting and, therefore, presented a question of fact for the jury's determination. *See Jones v. Commonwealth*, 202 Va. 236, 239-40, 117 S.E.2d 67, 70 (1960). Since there was credible evidence in support of the jury's resolution of this issue, we find no merit in Boblett's argument that the jury's verdict was contrary to law and the evidence. *See Parks*, 221 Va. at 498, 270 S.E.2d at 759.

For the reasons stated, we affirm the decision of the trial court.

*Affirmed.*

Koontz, C.J., and Moon, J., concurred.