## Richmond

# FRANK L. PARKS, SR.

## V.

# COMMONWEALTH OF VIRGINIA

October 10, 1980.

Record No. 791727.

Present: All the Justices.

*David M. Shapiro* (*Caudle & Shapiro,* on briefs), for appellant.
*Jerry P. Slonaker, Assistant Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

THOMPSON, J., delivered the opinion of the Court.

Frank L. Parks, Sr., was tried before a jury and convicted on two indictments for grand larceny charging obtaining money by false pretenses, Code § 18.2-178. He was sentenced to serve twelve months in jail and fined $1,000 on each charge. In this appeal Parks challenges the admissibility of certain evidence which he contends should have been suppressed. He also claims the evidence was insufficient to support the verdicts and to prove he participated in the sale of stolen vehicles.

On May 4, 1979, at 3:45 a.m., Police Patrolman Junious W. Wright was parked in his patrol car in the 300 block of North 5th Street in the City of Richmond. He then observed a loaded pickup truck pull into the adjacent block and turn "crossways in the street." Two men got out of the vehicle and opened the double doors of a nearby building. The driver subsequently backed the truck entirely inside the building. Wright testified that at this point his suspicions were aroused, and he proceeded to investigate. Wright circled the block in his patrol car and pulled in front of 408 North 5th Street where the truck had backed in the building. Upon seeing the police car, one of the men "jumped in behind the wheel of the truck" and "proceeded to drive out hurriedly," but, on its way out of the building, the vehicle struck the double doors of the building. Two of the men pulled the doors farther apart to allow the truck to clear, but, by

this time, Wright's patrol car had blocked the entranceway. Wright radioed for assistance, and after a backup unit arrived, he stepped out of his car to investigate.

The driver of the truck identified himself through use of a driver's license as "Frank Clarke Holmes." The man assured Wright he had every right to be in the building, and as proof he took a key and opened a small door on the building. Still not satisfied that the men were authorized to be on the premises, Wright walked to the rear of the truck, which was still partially inside the building, and copied the license number of the vehicle. While doing so, Wright noticed several automobiles inside the building. Wright asked "Holmes" if a business was being conducted "there," to which "Holmes" responded that the building served as a warehouse for "their" business in the West End of Richmond. Wright walked farther into the building and wrote down the vehicle identification numbers (VIN)[1] of two of the stored automobiles. Such numbers were visible on each dashboard just inside the windshield. Wright exited the building and allowed the three men to leave. Parks was not present at any time during these events.

Subsequent investigation revealed that the two VIN numbers belonged to automobiles which had been reported stolen. Accordingly, a search warrant was issued and executed. Detective Clarke, who was present during the entire search, testified that once inside the premises he observed "various parts of vehicles setting [sic] around, vehicles that were cut up into sections, engines, doors, tires and wheels." He saw "two rear sections of two different cars, one a '78 Mustang, two a '78 Olds Cutlass, and . . . a '75 Chevrolet model."

The Chevrolet automobile was a Monza from which the dashboard VIN number had been removed. The car was a "body minus various parts of the front." The confidential VIN number on this sectioned Monza matched the dashboard VIN number on a Monza registered to one Jeffrey Moore. Moore testified at trial that in February, 1979, he became interested in purchasing a 1975 Monza advertised by Parks in "Auto Trader Magazine." Parks and his wife were both present when Moore came to their home to examine the automobile. Moore purchased the car from Parks although he was led to believe

---

[1] According to the evidence, all American-made automobiles contain numbers unique to each automobile. The most prominent number is displayed on the dashboard or inside the windshield, but "confidential" VIN numbers are placed on various parts of the car not considered in plain view, *e.g.,* transmission casings, etc. These "confidential" numbers are so termed because their location is not generally disclosed to the public.

that Parks's wife actually owned the vehicle. Moore was informed by either Parks or his wife while both were present that the car was being sold due to their pending marital separation. The Monza sold to Moore was actually a 1976 model reported stolen in Maryland on December 11, 1978.

Detective Clarke also observed a partially dismantled 1977 Buick Century on the lower level of the North 5th Street premises. The confidential VIN number of this vehicle matched the dashboard VIN on a Buick Regal registered to one Gary Spake. Spake testified that he saw an advertisement in the "Trading Post" on or about December, 1978, offering for sale a 1977 Buick Regal. Spake inquired about the car because its price was $1,000 less than other similar cars on the market. Spake spoke with Parks over the telephone about the car and on two occasions went to view the automobile at the Parks residence. Each time, both Parks and his wife were present. Spake decided to purchase the vehicle, and he tendered a $100 deposit for which Parks issued a receipt as seller. The Buick Regal actually purchased by Spake was reported stolen in North Carolina on November 21, 1978.

Evidence was introduced by Parks that he "rented" the building at 408 North 5th Street primarily for his son's use. Testimony revealed that "he had no knowledge of anything that went on" in the building. Evidence was also presented to show Parks's son had directed him to stay away from the premises.

The trial court overruled Parks's Motion to Suppress all evidence obtained following Patrolman Wright's detention and alleged warrantless search of May 4, 1979, holding that the officer's actions were within the bounds of lawful investigative procedure. Parks assigns error to this ruling and further complains the evidence was insufficient to support his conviction.

## I. INVASION OF DEFENDANT'S PRIVACY.

On Parks's first assignment of error, the Commonwealth argues that Parks does not have standing to challenge Patrolman Wright's search of the North 5th Street premises because he lacked any legitimate expectation of privacy. Parks contends that the fact that he maintained a leasehold on the property is sufficient to establish his privacy interest against warrantless police intrusion into the building.

In *Rakas* v. *Illinois,* 439 U.S. 128 (1978), the Supreme Court abandoned separate inquiry into a particular defendant's "standing" to contest an allegedly illegal search and seizure in favor of a test for the presence of an expectation of privacy. Now only by examining

the "totality of the circumstances" can a decision be rendered as to whether a reasonable or legitimate expectation of freedom from government intrusion exists. *See also Rawlings* v. *Kentucky,* 448 U.S. 98 (1980). If Parks did not exhibit such dominion and control over the premises at 408 North 5th Street as would justify the conclusion that he had an expectation of privacy, he cannot assert Fourth Amendment protection.

Not disputed is the fact that Parks was the nominal lessee of the property at 408 North 5th Street. Yet Parks himself stated he had no knowledge of any of the events that went on in the building and that his purpose for renting the building was to "get his son off the street" and set him up in a business. The son directed Parks to stay off the premises; he did not want him "down there." [2] Parks's only apparent use of the building involved his storing of some furniture there. The record is devoid of any evidence that Parks ever attempted to regulate any activity there. Such circumstances are not indicative of a legitimate expectation of privacy.

Further, it is well settled that the Fourth Amendment guarantee cannot be invoked vicariously, that is, one has no standing to challenge an invasion of the privacy of a third party. *See Rakas* v. *Illinois, supra* at 133-34. *See also Brown* v. *United States,* 411 U.S. 223, 230 (1973); *Wong Sun* v. *United States,* 371 U.S. 471 (1963). Similarly, it was held in *Alderman* v. *United States,* 394 U.S. 165, 174 (1969), that a defendant who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence seized in

---

[2] Testimony of Parks's daughter, Stephanie Parks, revealed in pertinent part:

Q. All right. Did Frank, Jr., let you and your father in when you came down there all the time?

A. Well, for a while he did and he'd go down there sometimes, too, and paint and all that, but after a while Frank got where he wouldn't even go down there the weekends he'd go off with his friends, and then after I guess I'd been painting maybe a month and a half and he told me and my dad and Mary Anne just to stay out of there. Just not to come down there, and the [sic] told me he didn't want me to paint and as far as he was concerned, you know, I was fired off the job. He didn't want me down there.

Q. When was that?

A. I think it was at the end of October. I'm not sure exactly when, it was sometime in October towards the end. Maybe—possibly the beginning of November, but I think it was the end of October. It's been so long. I know it was either October or November.

Testimony of Detective Clarke revealed in pertinent part:

Q. [W]hat statements did he make to you?

A. He stated that he had to sign the lease on the building at 408 N. Fifth Street for his son, but he had no knowledge of anything that went on.

a search of a third person's premises has not had his Fourth Amendment rights violated.

These principles were recently reiterated in *United States* v. *Payner,* 447 U.S. 727 (1980), and *United States* v. *Salvucci,* 448 U.S. 83 (1980). In *United States* v. *Payner, supra,* the Court said:

> This Court discussed the doctrine of "standing to invoke the [Fourth Amendment] exclusionary rule" in some detail last Term. . . . We reaffirmed the established rule that a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. . . . And the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party. (Citations omitted.)

*Id.* at 731. In *United States* v. *Salvucci, supra,* the Court said:

> While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated . . . property rights are neither the beginning nor the end of this Court's inquiry. In *Rakas,* this Court held that an illegal search only violates the rights of those who have "a legitimate expectation of privacy in the invaded place." (Citations omitted.)

*Id.* at 91-2.

We conclude that Parks did not have any legitimate expectation of privacy in the premises at 408 North 5th Street and therefore had no standing to assert Fourth Amendment protection.

## II. SUFFICIENCY OF EVIDENCE.

Parks claims that the circumstantial evidence was insufficient to prove guilt beyond a reasonable doubt because it failed to show that he had knowledge of, or participated in, the preparation and sale of the stolen vehicles.

The evidence shows that Parks, a Richmond resident, traveled to Georgia and purchased two "salvaged" automobiles, a 1975 Chevrolet Monza and a 1977 Buick Century. The titles to these vehicles were registered in Georgia in Parks's name, but under a Georgia address. Parks subsequently transferred the titles to Virginia.

Evidence was then offered to show that Parks rented the building at 408 North 5th Street for his son's automobile repair business. Parks at one time assisted his son by painting and fixing the premises. It was in this building that police ultimately discovered the two automobiles Parks purchased in Georgia with their dashboard VIN plates missing. The confidential VIN numbers of the cars were traced to cars that had been sold to Spake and Moore. The Georgia cars' missing VIN plates were found attached to these vehicles. In reality the automobiles sold to Spake and Moore were stolen cars.

The dates and sequences of purchases and sales of the automobiles are also significant. Parks purchased the "salvaged" Buick Century in Georgia in October, 1978. The Buick Regal sold to Spake was reported stolen on November 21, 1978. Spake bought the stolen Buick Regal on December 12, 1978. Similarly, the "salvaged" Chevrolet Monza was bought by Parks in Georgia in November, 1978. The Monza purchased by Moore was reported stolen on December 11, 1978. The sale of the stolen Monza to Moore occurred in February, 1979.

Circumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the *only* method of proof. *Turner* v. *Commonwealth,* 218 Va. 141, 145-56, 235 S.E.2d 357, 360 (1977); *Toler* v. *Commonwealth,* 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949).

On appeal this court must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and *all fair inferences to be drawn therefrom." Wright* v. *Commonwealth,* 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954) (emphasis added). Bearing in mind that Parks personally purchased the two cars in Georgia and was present during and directly involved with the sale and transfer of the cars sold to Spake and Moore, we think it is obvious Parks knew these were different automobiles from those he bought in Georgia. Viewed in the light most favorable to the Commonwealth, the evidence is sufficient to sustain Parks's conviction of the two charges of obtaining money by false pretenses.[3]

For these reasons the judgment of the lower court is affirmed.

*Affirmed.*

---

[3] We observe that at least 124 pages of the 429-page appendix are not germane to any assignment of error, *see* Rule 5:38, and thus have been included unnecessarily. Copied into the appendix are such irrelevant items as witness subpoenaes including the returns of service, trial memoranda of law, and closing argument of counsel. This conduct demonstrates an utter disregard for the Rules of Court.