PETTY, J.,
concurring, with whom KELSEY and HALEY, JJ., join.
While I concur that a writ of actual innocence should not issue in this case, my rationale for this conclusion is quite different from that to which the majority subscribes. Therefore, I write separately.
Before we can address the merits of Turner’s petition, I believe that we must address the distinct procedural posture of this case. Prior to its decision to grant the writ of actual innocence, the three-judge panel of this Court made two preliminary decisions that were critical to the ultimate outcome. The first was to defer ruling on the Commonwealth’s motion to dismiss. The second was to remand the case to the circuit court for a factual finding regarding the credibility of the testimony of Billy Joe Brown. Before this Court sitting en banc can address the merits of the petition, we must address whether those two decisions are binding upon the full court. For me, the answer to that question is no. I believe that once this Court granted the Commonwealth’s motion for a rehearing en banc, it did more than just stay the panel’s decision that the writ should issue. I believe our grant of rehearing en banc also effectively vacated the other two decisions made by the panel. Thus, I believe that the full Court is bound by neither the panel’s decision that further *430 development of the facts by way of a remand is required, nor the panel’s order to the circuit court setting out the specific factual findings to be made by that court. For this reason, I believe that Turner’s petition for a writ of actual innocence based on non-biological evidence as well as the motion to dismiss filed by the Attorney General are now before this Court, sitting en banc, for our de novo consideration.
I further conclude that in considering Turner’s petition and the supporting affidavit, we are bound by the General Assembly’s manifest intent that the writ was to be an extraordinary measure granting extraordinary relief. The General Assembly did not choose to call this the “writ of more likely than not innocent,” or even the “writ of probably innocent.” It chose the phrase the “writ of actual innocence” because it intended for this writ to issue only when the newly-discovered evidence was of such a compelling nature that no reasonable juror would disagree that the defendant was both factually and legally innocent. Because I believe that the evidence that Turner has offered falls woefully short of the extremely high burden of proof established by the General Assembly, I believe this Court need go no further than to grant the Attorney General’s motion and dismiss the petition.
I. Procedural Posture
At the outset, I note that both the majority and the dissent refer to the “standard of review” to be used in analyzing this case. This is an example of how this Court has conflated our traditional appellate role with our role as the court having original jurisdiction in this case. There is no “standard of review” because we are not reviewing anything. We, the Court of Appeals sitting en banc, are charged by statute with assessing the weight to be assigned to the evidence before us and making the initial decision on whether the writ should issue.[24] Neither the majority nor the dissent have addressed *431 this unique procedural posture—how does a multi-panel appellate court, sitting en banc, consider a matter of original jurisdiction? I believe that this fundamental procedural Gordian knot must be unraveled before we can begin to consider the merits of the petition.
In doing so, we need to recognize why this case is unique among other cases that come before us. First, the General Assembly vested this Court—not the circuit court—with original jurisdiction over cases involving actual innocence petitions based on non-biological evidence. Code § 19.2-327.10.[25] Original jurisdiction is the “jurisdiction to take cognizance of a case at the outset, to try it, and to decide the issues.” Bryan A. Gamer, A Dictionary of Modem Legal Usage, 626 (2d ed.1995). One group of issues we are responsible for deciding are the factual findings that ultimately determine the outcome of the case. These factual findings include both the credibility of the witnesses and the weight of the evidence. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (The trier of fact has “the responsibility ... fairly to resolve conflicts in the testimony, to weigh the evidence, *432 and to draw reasonable inferences from basic facts to ultimate facts.”). And, the term “[t]he weight of the evidence refers to a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.” Tibbs v. Florida, 457 U.S. 31, 37-38, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982) (internal quotation marks and citations omitted). To be clear, the General Assembly’s grant of original jurisdiction to decide cases involving writs of actual innocence to this Court means that this Court sits as a trial court in these cases.[26] Just like the Supreme Court of Virginia, when exercising its original jurisdiction, this Court “considers the evidence and makes factual determinations de novo.” Judicial Inquiry & Review Comm’n v. Lewis, 264 Va. 401, 405, 568 S.E.2d 687, 689 (2002). Thus, it is this Court’s ultimate responsibility to make both the findings of fact and conclusions of law necessary to determine whether a writ should issue.[27]
*433 Additionally, when this Court granted the Attorney General’s petition for rehearing en banc, it vacated the panel opinion in this case. Glenn v. Commonwealth, 49 Va.App. 413, 423 n. 3, 642 S.E.2d 282, 287 n. 3 (2007) (en banc). “The grant of en banc review vacates the prior panel opinion in toto.” Id. (emphasis added), cited with approval in Moore v. Commonwealth, 276 Va. 747, 755, 668 S.E.2d 150, 155 (2008). This view of the effect of a grant of a rehearing en banc is consistent with that employed by a majority of the United States Courts of Appeals, which employ an en banc process similar to that employed by this Court. Compare 28 U.S.C. § 46(c); Fed. R.App. P. 35 with Code § 17.1-402(D) (setting forth the procedures for en banc review in the United States Courts of Appeal and this Court, respectively); see also Hon. George C. Pratt, 20A-355 Moore’s Fed. Practice—Civil § 335.11 (“The effect of an order granting en banc rehearing on the panel’s decision depends on local practice.”).
The Fourth Circuit falls within this majority, United States v. Moye, 454 F.3d 390, 394 (4th Cir.2006) (“Granting of rehearing en banc vacates the previous panel judgment and opinion.”), along with eight other federal circuits. See, e.g., SEC v. Tambone, 597 F.3d 436, 450 (1st Cir.2010) (reinstating portions of panel opinion that were vacated upon grant of rehearing); Guilmette v. Howes, 591 F.3d 505 (6th Cir.Ct.App. 2010) (granting rehearing en banc, and noting that Local Rule 35(a) of the Sixth Circuit Court of Appeals provides that “[t]he effect of granting a hearing en banc shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket sheet as a pending appeal”); Wis. Cmty. Servs. v. City of Milwaukee, Rec. No. 04-1966 (7th Cir.Ct.App. Aug. 31, 2005) (granting rehearing en banc, vacating the panel’s decision and judgment, staying the mandate, and restoring the case to the docket as a pending appeal); Socop-Gonzalez v. INS, 272 F.3d 1176, 1186 n. 8 (9th Cir.2001) (“The Court’s decision to rehear a case en banc effectively means that the original three-judge panel never existed---- [T]he en banc court acts as if it were hearing the case on appeal for the first time.”); 5th Cir. R. *434 41.3 (“Unless otherwise expressly provided, the granting of a rehearing en banc vacates the panel opinion and judgment of the court and stays the mandate.”); 11th Cir. R. 35.11 (“Unless otherwise expressly provided, the effect of granting a rehearing en banc is to vacate the panel opinion and to stay the mandate.”); but see United States v. Cavera, 550 F.3d 180 (2d Cir.N.Y.2008) (noting that the panel opinion was vacated after the en banc hearing); 10th Cir. R. 35.6 (“The grant of rehearing en banc vacates the judgment, stays the mandate, and restores the case on the docket as a pending appeal. The panel decision is not vacated unless the court so orders.”).
Because the decision to rehear a case en banc “effectively means that the original three judge panel never existed,” Socop-Gonzalez, 272 F.3d at 1186 n. 8, logic dictates that decisions of the panel that were critical to the ultimate outcome of the case are vacated as well. Otherwise, those members of this Court who were not members of the panel would be precluded from exercising their independent judgment regarding the merits of the entire petition. Hence, this Court, sitting en banc, is not bound by any of the panel’s decisions in this case. All of those decisions were a component of the panel’s final order that was nullified by this Court’s decision to grant a rehearing in this case. Therefore, as the Court with original jurisdiction, this Court, sitting en banc, has both the authority and the duty to decide the issues presented in this case as if the panel proceedings had never occurred.
The majority’s reliance on what appears to be an application of the interpanel accord doctrine,[28] see supra at 406, n. 4, 694 S.E.2d at 258, n. 4; 411-12 n. 9, 694 S.E.2d at 261-62 n. 9, ignores the fact that this case is before us for consideration by the full court. The majority notes that the panel that determined to certify this case for a credibility finding was separate *435 from the panel that ultimately granted the writ in this case, and to address the first panel’s decision at this time would be “inappropriate.”[29] While it is true that two separate panels were involved in this case, it cannot be said that the first panel’s decision was final or binding. This was an interlocutory order reflecting the initial panel’s decision to take further evidence, not a disposition of the case.[30] Further, even if the initial panel’s remand order were a final decision, this Court, sitting en banc, “may overrule any previous decision by any panel or of the full court.” Code 17.1-402(D). And it matters not whether the decision to be overruled is from the case on which we granted en banc review, or a previous decision of another panel. Startin v. Commonwealth, 56 Va.App. 26, 39-40, 690 S.E.2d 310, 316 (2010) (Powell, J.) (finding “a mistake exist[ed] in our prior decisions” and “exercising] our authority under Code § 17.1-402(D) [to] overrule [that decision]” (citations and internal quotation marks omitted)).
Thus, I believe that my colleagues’ position that we are now bound by the original panel’s decision to certify this case to the circuit court for a credibility determination, as well as the results of that credibility determination, is mistaken. The Commonwealth petitioned this Court to rehear the case. *436 When we granted that petition, we completely vacated the panel’s order. Upon the grant of rehearing en bam:, the panel’s decision, and all that went along with it, was nullified, and we must determine this case anew. Accordingly, I conclude that this case is in the same posture before this Court en bane as a misdemeanor conviction appealed from a district court to a circuit court—we start over.[31]
II. Background
In 1996, a jury convicted Dustin Turner of acting in concert with Billy Joe Brown in the abduction with intent to defile and the murder of Jennifer Evans. In an earlier jury trial, Brown had been convicted of the same crimes, as well as one count of attempted rape. This Court affirmed Brown’s convictions, Brown v. Commonwealth, 28 Va.App. 315, 504 S.E.2d 399 (1998), and, in an unpublished order, denied Turner’s petition for appeal on the issues of sufficiency and admissibility of evidence, Turner v. Commonwealth, Rec. No. 0381-97-1 (Va. Ct.App. Jan. 23, 1998). The Virginia Supreme Court also denied both Turner and Brown’s petitions for appeal. Turner v. Commonwealth, Rec. No. 980220 (Va. May 29, 1998); Brown v. Commonwealth, Rec. No. 982174 (Va. Feb. 23,1999).
Four years later, Brown provided a new version of the events of the crime that was inconsistent with his testimony at his own trial and the sundry other versions of the crime to which he had previously subscribed.[32] At that time, in an *437 interview with Turner’s attorney, Brown stated that he acted alone in killing Jennifer Evans. This newest version of the facts was consistent with, and apparently based on, Turner’s testimony at Turner’s trial. At that time, Turner testified that he and Jennifer Evans had been sitting together in the front seat of his car, which was parked in a busy parking lot of a bar. Brown came out of the bar and sat in the back seat behind Evans. According to Turner, Brown became enraged and suddenly reached around the seat and choked Jennifer Evans until she died. Turner testified that he was in shock, had made a futile attempt to pull Brown’s arms off of Evans, and, when commanded to by Brown, had driven away. Turner maintained that Evans died almost instantaneously.[33]
The transcript of Brown’s 2002 interview was filed by Turner as support for his petition. It begins with Brown explaining that during the days and weeks leading up to the *438 murder, he engaged in heavy alcohol, steroid, and marijuana use. On the actual day of the murder, Brown consumed a large quantity of alcohol as well. Because of Brown’s self-destructive behavior, he could only remember “bits and pieces” of the events on the night Jennifer Evans died, both because of his impaired memory and because he had blacked out several times that night.
While Brown’s new statement is consistent with Turner’s testimony at Turner’s trial, it is important to note that this “newly discovered testimony” is simply a version of the facts that had been presented to, and rejected by, Turner’s jury. In fact, three times in his recorded statement, Brown indicated that portions of his “memories” of that night came from reading Turner’s statement. First, Brown could not recall how he came to be in Jennifer Evans’ presence:
I left [the bar] and went to find [Turner]. I saw him in the car, him and Jennifer was [sic] sitting in the car. I had gotten in the car and they let me in the back seat and I began talking with them and I read Dustin [sic] testimony and honestly I don’t remember all the bits and pieces, I only remember bits and pieces, I don’t remember all the details.
(Emphasis added). Second, when Turner’s attorney asked Brown what he, Turner, and Evans discussed while all three of them were in the car, Brown’s memory failed him: “Honestly I vaguely remember. I think I was making rude comments to her. What [sic] I read the report that Dusty had given and I was making comments to her.” (Emphasis added). Finally, when Turner’s attorney asked Brown what Turner was doing while Brown was choking the victim—a critical question considering that Turner’s conviction was predicated on a concert of action theory—Brown responded, “Honestly, I vaguely remember a little bit but I read in his [Turner’s] report that he had tried to pull my hand away and I think I do recall, I believe at one point, I believe I recall his hand on my arm.” (Emphasis added).
Turner’s attorney subsequently had the recorded statement reduced to an affidavit for the purposes of Turner’s petition *439 for actual innocence. In the version of the affidavit[34] that was submitted with the petition for actual innocence, Brown described the act of Evans’ murder as follows:
I left the bar and went to find Dusty. I saw him in the parking lot. He and Jennifer were sitting in the car. I had gotten in the car and they let me in the back seat and I began talking with them. I was being vulgar and I vaguely recall [sic]. We were sitting there talking and next thing you know I reached up and choked Jennifer. I did this on my own without any prior discussion with Dustin Turner. He did not encourage me in any way and in fact, I remember one instance while I was choking Jennifer, Dustin trying to pull my hands away. Jennifer became unconscious and I am certain she was dead at that time. We were still in the parking lot. I do not know why I did it.
Turner, relying on the affidavit, then filed a petition for a writ of actual innocence in this Court pursuant to Code §§ 19.2-327.10 through 19.2-327.13. The Attorney General filed a motion to dismiss, arguing that Brown’s inherently incredible *440 statement could not meet the burden of proof imposed on Turner by Code § 19.2-327.13. Upon consideration of the pleadings and the record, a panel of this Court, without acting on the Commonwealth’s motion to dismiss, certified this case to the circuit court, pursuant to Code § 19.2-327.12,[35] with instructions to assess Brown’s credibility. Because the circuit court found Brown’s statement credible,[36] the panel granted *441 Turner’s petition. Turner v. Commonwealth, 54 Va.App. 458, 491-92, 680 S.E.2d 312, 329 (2009).
Upon the Commonwealth’s petition for rehearing, this Court granted an en banc hearing to consider Turner’s petition. As discussed above, because this Court has original jurisdiction in cases involving writs of actual innocence based on non-biological evidence, it is our responsibility to determine both the scope of the evidence before us and the merits of Turner’s petition. Code § 19.2-327.10. Finally, this Court sitting en banc must now “consider and decide the case” and in doing so we “may overrule any previous decision of any panel or of the fuH court.” Code § 17.1-402(D).
III. Discussion
I believe that the record before us is sufficient to decide the case and no further development of the facts is necessary. Upon consideration of that record, I believe we must grant the Attorney General’s motion to dismiss Turner’s petition. The evidence upon which Turner exclusively relies—Brown’s affidavit and statement—simply does not meet the high burden of proof set forth in Code §§ 19.2-327.11 and 19.2-327.13. Brown’s highly impeachable and dubious statement does not, *442 and never could, prove that Turner is factually and legally innocent of the crime for which the jury convicted him. Hence, as the subsequent discussion shows, there is no reason for this Court to remand the case to the circuit court for an evidentiary hearing. This Court is perfectly capable of evaluating the petition and supporting affidavit in light of the statutory burden of proof. Simply put, Turner’s proffered after-discovered evidence simply is not of the requisite conclusive nature to warrant granting the writ of actual innocence.
“Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears____” Herrera v. Collins, 506 U.S. 390, 399-400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993). Accordingly, “in the eyes of the law, petitioner does not come before the Court as one who is ‘innocent,’ but, on the contrary, as one who has been convicted by due process of law of [a] brutal murder[ ].” Id. In order to overcome the fact that he is, as a matter of law, guilty of Jennifer Evans’ murder, Dustin Turner must meet quite possibly the heaviest burden the law imposes. According to Code § 19.2-327.11, a petitioner must produce evidence that is not only material to the issue of actual innocence, but is also the kind of evidence that “when considered with all of the evidence in the current record ... prove[s] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.” Code § 19.2-327.11(A)(vii) (emphasis added).
This Court is required to apply Code § 19.2-327.11(A)(vii) in a manner that is “harmonious with its legislative purpose and [to] avoid any construction defeating that purpose.” Carpitcher v. Commonwealth, 273 Va. 335, 345, 641 S.E.2d 486, 492 (2007). To that end, we must “consider the words the legislature has employed, the subject matter of the statutes governing writs of actual innocence based on non-biological evidence, the statutes’ apparent object, and the legislative purpose in enacting the statutes[.]” Id. (citing Esteban v. Commonwealth, 266 Va. 605, 609, 587 S.E.2d 523, 526 (2003); Commonwealth v. Bruhn, 264 Va. 597, 602, 570 S.E.2d 866, 869 (2002); Lucy v. County of Albemarle, 258 Va. 118, 129-30, 516 S.E.2d *443 480, 485 (1999); Mapp v. Holland, 138 Va. 519, 527-28, 122 S.E. 430, 432-33 (1924)). The history of both the biological and non-biological writs of actual innocence is instructive as to the General Assembly’s purpose in enacting them. Hence, a discussion of that history can guide this Court in applying the law in accordance with the General Assembly’s intent.
A. Statutory History
1. Development of the Writ
Approximately a decade ago, scientific advances and Virginia’s twenty-one-day rule collided. At that time, an individual who had been convicted of a crime could only challenge his conviction on the basis of after-discovered evidence within twenty-one days of the trial court’s entry of final judgment— regardless of whether the evidence completely exonerated him. See Rule 1:1. Advances in the preservation, extraction, and analysis of human biological evidence, commonly referred to as DNA evidence, highlighted a flaw in the application of the twenty-one-day rule. Using DNA evidence, several convicts, including one on death row,[37] were able to conclusively prove that they did not commit the crimes for which they had been convicted. In each of these cases, the proof of innocence often was only obtained well after the twenty-one-day period had run. See, e.g., William J. Dinkin and Cullen D. Seltzer, Criminal Law and Procedure, 35 U. Rich L.Rev. 537, 561-64 (2001); Marjorie A. Shields, DNA Evidence as Newly Discovered Evidence Which Will Warrant Grant of New Trial or Other Postconviction Relief in Criminal Case, 125 A.L.R.5th 497 (collecting cases, statutes, and court rules). Virginia was thus placed in the indefensible position of prohibiting an *444 individual who was demonstrably and factually innocent of a crime from seeking judicial relief from his incarceration.
In response to that situation, our General Assembly created an exceedingly narrow exception to Virginia’s twenty-one-day rule: the writ of actual innocence based on after-discovered biological evidence (biological evidence writ). 2001 Va. Acts ch. 878, 874; see also 35 U. Rich L.Rev. at 562 (discussing the passage of the writ of actual innocence based on after-discovered biological evidence); Crime Comm’n Rep. at 5 (discussing the twenty-one-day rule).[38]
Following the enactment of the biological evidence writ, members of the General Assembly recognized that there could be other conclusive, exonerating evidence besides DNA evidence, and proposed the creation of a writ of actual innocence based on non-biological evidence. Crime Comm’n Rep. at 7, 12. According to the Crime Commission’s Report, the proposed legislation was designed to “use[ ] the same high level of proof that must be met in order to obtain relief’ under the biological evidence writ. Id. at 16 (emphasis added). The Commission’s proposed legislation, which eventually became the writ for actual innocence based on non-biological innocence, Code §§ 19.2-327.10 through 19.2-327.13, closely tracked the language of the biological evidence writ and, just like the biological evidence writ, reflected Virginia courts’ long-held suspicion of after-discovered evidence. Crime Comm’n Rep. at 13. Because the General Assembly relied “on Virginia’s traditional treatment of after-discovered evidence,” *445 Id. at 7 & 7 n. 13, the writs reflect the deference with which Virginia has always viewed the final judgment of a trial court, In re Carpitcher, 47 Va.App. 513, 526, 624 S.E.2d 700, 706 (2006) (“A verdict resulting from a trial, during which the evidence has been tested by the adversarial process, is presumed to be correct, and, thus, a heavy burden is placed upon those seeking to overturn it.”).
2. After-Discovered Evidence Standard
As part of that deference for the finality of judgment, Virginia law views motions for a new trial based on after-discovered evidence with disfavor. They “are considered with special care and caution, and are awarded with great reluctance.” Commonwealth v. Tweed, 264 Va. 524, 528, 570 S.E.2d 797, 800 (2002). This is so because the law “give[s] every litigant one, and only one, opportunity of presenting his case to the jury or before the court, and when this has been had, the results of the trial will not usually be disturbed____” Pauley v. Commonwealth, 151 Va. 510, 518, 144 S.E. 361, 363 (1928). It is well settled in Virginia law that a new trial will be granted on the grounds of after-discovered evidence only if the moving party can prove that: 1) the evidence was discovered since the trial; 2) the evidence could not, by the exercise of reasonable diligence, have been discovered before the trial terminated; 3) the evidence is material and such as ought to produce a different result on the next trial; and 4) the evidence is not merely cumulative, corroborative, or collateral. See, e.g., Avent v. Commonwealth, 279 Va. 175, 206, 688 S.E.2d 244, 261 (2010).
However, in recognition that the relief sought by actual innocence petitioners is complete exoneration and release from prison—instead of a new trial—the burden of proof an actual innocence petitioner must meet with his after-discovered evidence is much higher. Criminal defendants seeking a new trial need only show that the after-discovered evidence would likely lead to a different result upon retrial. In sharp contrast, actual innocence petitioners must produce clear and convincing evidence that proves that “no rational trier of fact *446 could have found proof of guilt beyond a reasonable doubt” in light of the newly-discovered evidence, taken together with the rest of the evidence in the case. Code §§ 19.2—327.3(A)(vii); 19.2-327.11(A)(vii). In other words, the new evidence must conclusively show that the petitioner’s guilt is a factual impossibility.
The General Assembly, as reflected in the language of the statute and the purpose of the legislation, intended that an actual innocence petitioner—regardless of whether he proceeds under the biological evidence writ or the non-biological evidence writ—meet a burden of showing not merely evidence that could call his conviction into question, but evidence that actually exonerates him of the crime for which he was convicted.[39] Indeed, our Supreme Court has specifically recognized this high burden:
By enacting these provisions, the General Assembly intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crimes for which they were convicted____ [The writ was] not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial.
Carpitcher, 273 Va. at 345, 641 S.E.2d at 492 (emphasis added).
Because the General Assembly adopted the same requirements for the non-biological writ as it did for the biological evidence 'writ, the General Assembly clearly demonstrated its intent to limit the application of the writ to newly-discovered evidence of the same conclusive nature as DNA evidence. Thus, the writ at issue in this case establishes, and was *447 intended by the General Assembly to establish, an extraordinarily high burden. Although there is no restriction on the type of evidence upon which a petitioner may rely in his attempt to prove his actual innocence, see Code § 19.2-327.11; Crime Comm’n Rpt. at 16, only “a truly persuasive demonstration of actual innocence made after trial” will provide “the necessarily ... extraordinarily high” “threshold showing” required to demonstrate actual innocence. Herrera, 506 U.S. at 417-18, 113 S.Ct. at 869 (O’Connor, J., concurring) (discussing the assumed due process right a prisoner would have to challenge a capital sentence with after-discovered evidence of actual innocence). A truly persuasive demonstration of actual innocence, then, will prove to be a difficult task, because evidence that will meet the high standard required by Code § 19.2-311(A)(vii) is of necessity limited.
B. Burden of Proof
Unless the petitioner proffers after-discovered evidence that can prove, by clear and convincing evidence, that “no reasonable trier of fact could have found proof of guilt beyond a reasonable doubt,” upon consideration of the new evidence along with the evidence presented at trial, Code § 19.2-327.11(A)(vii), our inquiry should end, and we should dismiss the petition. Code § 19.2-327.13. If the proffered evidence cannot conclusively establish innocence, there is simply no reason to proceed further; factual findings are not “require[d].” Code § 19.2-327.12.
Of course, the General Assembly did not create this Court’s function in determining whether the after-discovered evidence can support the petitioner’s claim out of whole cloth. Again, this procedure is similar to that employed by a circuit court in deciding whether to grant a motion for a new trial based on after-discovered evidence. “When ... evidence supporting the new trial motion is contradicted by evidence in opposition to the motion, the circuit court is not permitted to presume that the moving party’s evidence is true but is required to weigh all the evidence presented____” Orndorff v. Commonwealth, 271 Va. 486, 505, 628 S.E.2d 344, 354 (2006) (citations omitted). In sorting through that conflicting evidence, “the *448 court’s role resembles that of a fact finder in determining whether the evidence is such that it should produce an opposite result on the merits at a new trial.” Id.
However, unlike a circuit court’s evaluation of after-discovered evidence proffered in support of a motion for a new trial, this Court must evaluate the probative value of uncorroborated, after-discovered witness testimony in an actual innocence proceeding through the prism of the incredibly high burden of proof set by the General Assembly. Effectively, we must ask ourselves whether this new testimony would produce the certainty of opinion in the minds of jurors that the statute demands. This type of witness testimony is problematic because it is, by its very nature, uncertain.
When a witness testifies to a fact, he is testifying not to what that fact actually is, but rather his belief in or perception of that fact. See Judicial Inquiry & Review Comm’n v. Peatross, 269 Va. 428, 445-46, 611 S.E.2d 392, 401 (2005) (determining that evidence of credibility was in equipoise when three witnesses gave conflicting evidence based on each witness’ “honest[ ] • • • recollection of the events____”). The witness could be telling the truth as he understands it, but he could be mistaken due to poor eyesight or poor memory. Or, the witness can appear entirely credible, but actually be lying. Either way, testimony can be credible—that is, believable— without being factually dispositive of the issue of innocence. That is why our criminal justice system allows twelve jurors, as triers of fact, to individually assess and weigh testimony and assign it such credence as each individual juror determines appropriate. Jurors are instructed that they may “accept or disregard all or part of the testimony of a witness as [they] think proper” and that they may “determine which witnesses are more believable and weigh their testimony accordingly.” 1-2 Virginia Model Jury Instructions, Criminal Instruction No. 2.500 (2009). Hung juries are proof positive that there are times when reasonable jurors do not agree on whether to believe a witness’ testimony.[40]
*449 That is not to say that a newly-discovered witness’ testimony can never be conclusive enough to survive a motion to dismiss the petition. However, to reach that point, the after-discovered testimonial evidence must “undermine[ ] the prosecution’s entire case.” In re Clark, 5 Cal.4th 750, 759, 21 Cal.Rptr.2d 509, 514, 855 P.2d 729, 734 (1993). “It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge *450 or jury.” Id. at 766, 21 Cal.Rptr.2d at 519, 855 P.2d at 739. Nor is it sufficient that the new evidence, when combined with other evidence favorable toward the petitioner, put the evidence as to the petitioner’s guilt or innocence in equipoise. See Peatross, 269 Va. at 446, 611 S.E.2d at 402 (holding that evidence which is in equipoise cannot satisfy the clear and convincing burden of proof). Instead, only evidence that “casts fundamental doubt on the accuracy and reliability of the proceedings ... [and] undermine[s] the entire prosecution case and point[s] unerringly to innocenee[,]” In re Clark, 5 Cal.4th at 766, 21 Cal.Rptr.2d at 519, 855 P.2d at 739, needs to be further examined for credibility.
That is exactly the situation that was before the Supreme Court in both Carpitcher and Johnson v. Commonwealth, 273 Va. 315, 641 S.E.2d 480 (2007). In both of those cases, the after-discovered testimony consisted of the recantation of testimony presented at trial and without which the petitioner could not have been convicted. If the recantation were true, there would have been no evidence that the petitioner committed the crime for which he was convicted. Or, put another way, if the only evidence supporting the convictions proved to be false, no reasonable juror could have convicted the petitioners in those cases.
In Carpitcher, the complaining witness recanted her trial testimony that Carpitcher sexually abused her. 273 Va. at 340, 641 S.E.2d at 489. The complaining witness was “the Commonwealth’s only witness during the trial, and, thus, the jury predicated Carpitcher’s convictions solely upon her testimony.” Carpitcher, 47 Va.App. at 517-18, 624 S.E.2d at 702 (2006) (emphasis added). Thus, because the only evidence supporting Carpitcher’s conviction would have been eliminated had the recantation testimony been true, no reasonable juror could have convicted Carpitcher. Carpitcher, 273 Va. at 345-46, 641 S.E.2d at 492-93.
There, the Supreme Court affirmed this Court’s determination to certify two specific questions to the circuit court: first, “[w]hether the victim in this case has recanted the testimony *451 she gave at trial in any material way -with regard to the culpability of the petitioner;” and second, “if such material recantation of her trial testimony has taken place, whether or not such recantation is the product of duress, undue influence or inappropriate pressure from others.” Id. at 341, 346, 641 S.E.2d at 489, 493. The Supreme Court also affirmed this Court’s subsequent decision to dismiss the petition upon the circuit court’s finding that the victim was no longer a credible witness because “she had testified inconsistently about the same issues on three separate occasions” and had been subjected to threats and intimidation designed to elicit her recantation. Id. at 341, 348-49, 641 S.E.2d at 489-90, 494.
The Supreme Court came to a similar conclusion in Johnson. There, the petitioner was convicted of capital murder and conspiracy to commit capital murder for hire. 273 Va. at 318, 641 S.E.2d at 482. One of Johnson’s co-conspirators, Smith, testified at Johnson’s trial and established that “Johnson asked Smith to kill [the victim] or find someone to kill her. According to Smith, Johnson stated that he would ‘give his next paycheck’ to any person willing to kill [the victim].” Id. at 319, 641 S.E.2d at 482. Smith’s testimony provided the critical link between Johnson and the crime for which Johnson was convicted. Several weeks after the trial, however, Smith recanted his trial testimony, and Johnson relied upon that recantation in pursuit of a writ of actual innocence. Id. at 319-20, 641 S.E.2d at 482-83. This Court certified the question of Smith’s credibility to the circuit court. Id. at 320, 641 S.E.2d at 483. After the circuit court found that Smith’s testimony was “neither logical or believable,” this Court dismissed the petition, and our Supreme Court affirmed. Id.
This case is distinguishable from Carpitcher and Johnson in that Brown’s most recent statement in no way undermines the Commonwealth’s entire case at trial. First and foremost, Brown did not testify at Turner’s trial—thus, his new statement, unlike the recantations in Carpitcher and Johnson—did not reduce the quantum of evidence presented at trial and *452 with which the Commonwealth met its burden.[41] Second, in a related point, the Commonwealth did not rely on Brown to make the critical link between Turner and the crime. Instead, the Commonwealth relied upon extensive direct and circumstantial evidence[42] to carry its burden of proving that Turner participated in the murder and abduction of Jennifer Evans. Finally, Brown’s proffered testimony is simply a repetition of the testimony Turner gave at trial—testimony that was specifically rejected by the jury that heard the case.
C. Evaluating the Evidence
Thus, in evaluating the petition, this Court should view Brown’s affidavit along with the other evidence in the record to determine whether Turner’s newly-discovered evidence could possibly be conclusive on the issue of his innocence. Code § 19.2-327.11(A)(vii) (“[Wjhen considered with all of the other evidence in the current record [the after-discovered evidence] will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.”). If the newly-presented evidence is not of such a clear and convincing nature that we can say that no reasonable juror would have voted to convict, he has failed to state a claim and we must dismiss the petition.
*453 To determine whether Turner stated a claim, this Court need only evaluate the evidence he proffered. This Court must then must weigh the proffered after-discovered evidence with the evidence in the trial record and decide whether the after-discovered evidence is so absolute and compelling that no reasonable juror would have voted to convict the accused in light of that evidence. See House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 2078, 165 L.Ed.2d 1 (2006) (discussing claims of actual innocence in the federal habeas corpus context) (“Because [an actual innocence] claim involves evidence the trial jury did not have before it, the inquiry requires the ... court to assess how reasonable jurors would react to the overall, newly supplemented record.”).
Hence, it is our proper function to evaluate the probable effect this evidence would have had on a jury. When properly viewed through the prism of the statute, Brown’s statement becomes just another piece of evidence that the jury would have considered. Even though Brown was undeniably an eyewitness to the crime, it is quite foreseeable that a reasonable juror would have considered Brown’s statement as what it was—simply one more in a series of conflicting and unreliable tales emanating from the steroid and alcohol impaired memory of a self-confessed murderer. It is quite reasonable to conclude that a hypothetical juror would have chosen to ignore Brown’s testimony in its entirety and decide the case on the same evidence considered by the original jury. In fact, finders of fact are explicitly allowed to do just that under our jurisprudence.[43] See Bridgeman v. Commonwealth, 3 Va.App. 523, 528, 351 S.E.2d 598, 601 (1986) (The finder of fact may accept or reject a witness’ testimony in whole or in part.); see *454 also Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (A fact finder is at liberty to reject the conflicting evidence presented on behalf of the accused.). Furthermore, Brown’s many inconsistent prior statements, which would have certainly been used to impeach his testimony, make his statement the very antithesis of the kind of evidence that can support a petition for a writ of actual innocence: that is, rock-solid evidence that has the same unquestionable, conclusive nature as DNA evidence.
IV. Conclusion
It is incumbent upon an actual innocence petitioner to present clear and convincing evidence proving that his guilt is a factual impossibility. The writ was “not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial.” Carpitcher, 273 Va. at 345, 641 S.E.2d at 492. Even assuming that Brown’s testimony would have been consistent with his affidavit, that testimony is not, either by its nature or its weight, sufficient to convince me that no reasonable juror would have voted to convict Turner had they heard it. Therefore, in my opinion, Turner has not met the high standard of proof set by the General Assembly in Code § 19.2-327.11(A)(vii). I would grant the Commonwealth’s motion and dismiss Turner’s petition pursuant to Code § 19.2-327.13.

. This is why the majority is incorrect in its assertion that "the issue of whether the referring panel needlessly sent the matter back to the circuit court for factual findings is not an issue on which either party *431 sought review, nor is it an issue granted by this Court for consideration en banc." Supra at 412 n. 9, 694 S.E.2d at 261 n. 9. We do not sit to review the decision of either the panel or of the circuit court—we sit to decide the issue before us.

. When developing the writ of actual innocence based on non-biological evidence, the General Assembly surveyed the post-conviction relief available to actual innocence claimants in all fifty states, and rejected the approaches of states that vested trial-level courts with original jurisdiction in cases involving claims of actual innocence. See Writ of Actual Innocence Based on Non-Biological Evidence, Rep. of the Va. State Crime Comm'n (2004), App'x 5 (hereinafter Crime Comm'n Rep.). Some states vest their trial courts with this authority by statute, see, e.g., N.Y. C.P.L. § 440.30 (Consol.2010) (setting forth procedures for motions to vacate judgment or to set aside sentence on the basis of after-discovered evidence, including DNA evidence); Ill. Comp. Stat. § 116.3 (2007) (setting forth a specific procedure for actual innocence claimants to follow in the trial court), while others do so by decision, see, e.g., Summerville v. Warden, 229 Conn. 397, 641 A.2d 1356, 1369 (1994) ("[A] substantial claim of actual innocence is cognizable by way of a petition for a writ of habeas corpus, even in the absence of proof by the petitioner of an antecedent constitutional violation that affected the result of his criminal trial.”).

. Indeed, the delineation between original and appellate jurisdiction is one of the most basic—and longstanding—in American jurisprudence. See Marbury v. Madison, 5 U.S. 137, 175-76, 1 Cranch 137, 2 L.Ed. 60 (1803) (discussing the difference between original and appellate jurisdiction and noting that "the essential criterion of appellate jurisdiction” is “that it revises and corrects the proceedings in a cause already instituted, and does not create that cause” and that to "issue ... a writ ____seems not to belong to appellate, but to original jurisdiction").

. Of course, we recognize that there are situations where an evidentiary hearing will be required to resolve certain issues. For those situations, the General Assembly provided a mechanism in Code § 19.2-327.12 for the taking of additional evidence in the circuit court to enable this Court to ultimately determine the exonerating nature of the proffered evidence. For instance, DNA analysis may conclusively establish that the biological sample did not come from the defendant. However, its exonerating nature may well depend on where the sample was found. Blood found on a victim's body may well be quite probative of innocence; blood found on the street a block away, perhaps not. Similarly, before this Court could evaluate the probative value of an after-discovered video recording apparently showing another individual committing the crime, an evidentiary hearing might be necessary to authenticate the recording. This does not mean, however, that all factual findings, including credibility, need be referred to the circuit court. If the proffered testimony is sufficiently incredible on its face, we are perfectly capable of making that determination.

. Under Virginia law, a decision of one panel "becomes a predicate for application of the doctrine of stare decisis " and cannot be overruled except by the Court of Appeals sitting en banc or by the Virginia Supreme Court. Johnson v. Commonwealth, 252 Va. 425, 430, 478 S.E.2d 539, 541 (1996).

. I note that the panel that entered the order sending this matter to the circuit court for specific fact finding consisted of two active members of this Court and one senior judge. If the majority is correct in its assertion that this decision is binding on the full court, it would mean that all but two of the members of this en banc Court would be denied the opportunity to opine on this critical decision. When the General Assembly granted original jurisdiction to this Court, it is my belief that it intended all the members of the Court, when sitting en banc, to participate equally in all of the decisions that determine whether this extraordinary writ should issue.

. This Court frequently enters preliminary orders during the adjudication of our appellate cases. See, e.g., Woody v. Commonwealth, 53 Va.App. 188, 193, 670 S.E.2d 39, 42 (2008) (explaining that this Court directed the trial court to clarify inconsistencies in its final order prior to our deciding the appeal). Adopting an approach whereby each of these orders could become the subject of rehearings en banc could bog this Court down in an endless cycle of interlocutory rehearings.

. A de novo appeal vacates the decision of the lower court as if it had never occurred and provides for a wholly new trial in the circuit court. See, e.g., Peterson v. Commonwealth, 5 Va.App. 389, 398, 363 S.E.2d 440, 445 (1987) ("An appeal taken in accordance with Code § 16.1-132 is, in effect, a statutory grant of a new trial to the accused. ‘It annuls the judgment of the inferior tribunal as completely as if there had been no previous trial.’" (quoting Gaskill v. Commonwealth, 206 Va. 486, 490, 144 S.E.2d 293, 296 (1965))).

. The first two times Brown was questioned by law enforcement regarding Jennifer Evans’ disappearance, he denied having any knowledge of her. A few days later, Brown and Turner were both taken to the FBI office in Richmond for questioning. At that time, in the space of five hours, Brown told law enforcement officers three different *437 stories regarding Jennifer Evans’ death. First, he told FBI agents that he did not have any knowledge of what happened to Jennifer Evans. Second, Brown stated that he and Turner took Jennifer Evans to an area near some beach houses and, when she began to struggle, jointly killed her—Turner choking her while Brown held her arms and legs. Third, Brown told law enforcement that he came out to the car, from the bar, and found that Turner had killed Jennifer Evans when she resisted his sexual advances. Brown’s sworn testimony at his own trial essentially tracked his third statement—that Turner acted alone in killing Jennifer Evans—and is inconsistent with his sworn affidavit and his sworn testimony before the circuit court in this action. Brown also explained in his statement to Turner’s attorney that Brown originally told his own attorney in 1999 that he acted alone in killing Jennifer Evans. Brown’s attorney did not believe him. A few weeks later, Brown recanted his story. Finally, as the Attorney General points out, in 2000 through 2001 Brown asserted in his pro se habeas corpus pleadings that Turner acted alone in killing Jennifer Evans, and that at most, Brown was guilty of being an accessory after the fact to Jennifer Evans’ murder.

. At Turner’s trial, the jury was also presented evidence from the medical examiner who indicated that it typically takes three-to-five minutes of constant pressure on the carotid artery to deprive the brain of sufficient oxygen and blood flow to cause death by manual strangulation. Moreover, the security guard who patrolled the parking lot in which Turner claimed his car was parked at the time of the murder testified at Turner’s trial. According to the security guard, he patrolled the parking lot during the relevant time and saw nothing amiss.

. Brown’s affidavit, upon which Turner is basing his petition, is surrounded by inconsistencies. In fact, there are, inexplicably, two versions of the affidavit that are identical except for an altered second page. It is apparent upon examining the altered page that the font size has been changed to ensure that the altered second page ends at the same point as the unaltered second page. The altered version was attached to Turner's petition, and includes the following testimony from Brown:
We were sitting there talking and next thing you know I reached up and choked Jennifer. I did this on my own without prior discussion with Dustin Turner. He did not encourage me in any way and in fact, I remember one instance while I was choking Jennifer, Dustin trying to pull my hands away. Jennifer became unconscious and I am certain she was dead at that time.
The other affidavit, which had been provided to the Attorney General’s office by Turner, stated the following:
We were sitting there talking and next thing you know I reached up and choked Jennifer. I did this on my own without any prior discussion with Dustin Turner. He did not encourage me in any way and in fact, I remember one instance while I was choking Jennifer, Dustin trying to pull my hands away. Jennifer became unconscious and I believed that she was dead. I fell back in the seat, and she woke up. I then choked her again until blood came out of her nose and am certain that she was dead at that time.

. Code § 19.2-327.12 states, in pertinent part:
If the Court of Appeals determines ... that a resolution of the case requires further development of the facts, the court may order the circuit court in which the order of conviction was originally entered to conduct a hearing ... to certify findings of fact with respect to such issues as the Court of Appeals shall direct.

. I note that other members of the Court believe that these factual findings are conclusively binding on this Court. Although my view of the procedural posture of this case means that these factual findings are now irrelevant to the case before us, I do take issue with this view of the circuit court’s factual findings. The Supreme Court discussed the standard of review for factual findings made pursuant to Code § 19.2-327.12 in Carpitcher:
This is the first occasion we have had to state the standard of review we will apply in this Court to an appeal of a final judgment of the Court of Appeals disposing of a petition for a writ of actual innocence based on non-biological evidence. The judgment before us in this appeal is based partly on factual findings certified by the circuit court in response to the Court of Appeals’ order referring certain factual issues to the circuit court pursuant to Code § 19.2-327.12. Such factual findings are similar to circuit court findings made under Code § 8.01-654(C) in habeas corpus cases in which we have original jurisdiction and have referred factual issues to the circuit court for an evidentiary hearing. Therefore, we will apply to the factual findings contained in the record of the Court of Appeals a standard of review similar to the standard we apply to factual findings entered in our original jurisdiction habeas corpus proceedings. We will be bound by the factual findings in the present record as approved by the Court of Appeals, unless they are plainly wrong or without evidence to support them.
Carpitcher v. Commonwealth, 273 Va. 335, 342-43, 641 S.E.2d 486, 490 (2007) (emphasis added) (citing Yarbrough v. Warden, 269 Va. 184, 195, 609 S.E.2d 30, 36 (2005); Lovitt v. Warden, 266 Va. 216, 229, 585 S.E.2d 801, 808 (2003); Hedrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 846 (2002)).
A careful examination of this language from Carpitcher reveals two things. First, the Virginia Supreme Court was stating the standard of review it would apply in its appellate function of reviewing this Court’s dismissal of an actual innocence petition. Second, the circuit court’s *441 factual findings pursuant to Code § 19.2-327.12 are only binding if they are approved by the Court of Appeals.
Our Supreme Court’s use of the word "approved” is consistent with this Court’s role as the ultimate finder of fact in cases involving the writ. We are not required to rubber-stamp the circuit court's credibility determination made pursuant to Code § 19.2-327.12. Instead, we must independently review the record, and make the necessary factual findings ourselves. See, e.g., Hudson v. Clark, 200 Va. 325, 329, 106 S.E.2d 133, 136 (1958) (A chancellor retains his authority to reject the findings of a commissioner in chancery if they are plainly wrong or at odds with the weight of the evidence); Higgins v. Higgins, 205 Va. 324, 328-29, 136 S.E.2d 793, 796 (1964) ("When a cause is referred to a commissioner in chancery the chancellor does not delegate his judicial function to him____ It is the duty of the chancellor to weigh the evidence according to correct principles of law and arrive at his own conclusions.”). See also Judicial Inquiry & Review Comm’n v. Peatross, 269 Va. 428, 444, 611 S.E.2d 392, 400 (2005) (In exercising its original jurisdiction, our Supreme Court “independently review[s] the record created by the Commission [to] determine whether there is clear and convincing evidence of [an ethical] violation----”).

. On October 2, 2000, Former Governor James S. Gilmore, III pardoned Earl Washington, a death-row inmate who had been convicted of rape and capital murder. Governor Gilmore pardoned Washington on the basis of after-discovered DNA evidence because "a jury afforded the benefit of the DNA evidence and analysis available today would have reached a different verdict regarding the guilt of Earl Washington, based on reasonable doubt.” Rep. to the Gen. Assemb., "List of Pardons, Reprieves, and Other Forms of Clemency,” Sen. Doc. No. 2 (2001).

. According to Code § 30-156(A), The Virginia State Crime Commission is a part of the legislative branch of the Commonwealth of Virginia.
The purpose of the Commission shall be to study, report and make recommendations on all areas of public safety and protection____The Commission shall make such recommendations as it deems appropriate with respect to the foregoing matters, and shall coordinate the proposals and recommendations of all commissions and agencies as to legislation affecting crimes, crime control and criminal procedure.
Thus, the Crime Commission’s report on the need for a non-biological evidence writ of actual innocence is a vital resource in ascertaining the General Assembly’s purpose in enacting the statutes we seek to apply in this case.

. The General Assembly surveyed the available post-conviction relief under the laws of all fifty states when developing the non-biological evidence writ. See Crime Comm’n Rpt. at App’x. 3 & 4. Thus, the General Assembly considered and rejected approaches favored by other states, including awarding a retrial, using state habeas review as a vehicle for actual innocence claims, or applying a lesser standard of proof that would merely call the petitioner’s conviction into question, rather than require the petitioner to demonstrate his factual innocence.

. The majority contends that our jurisprudence "equate[s] credibility with truth.” Supra at 410 n. 7, 694 S.E.2d at 260 n. 7. The majority *449 relies on Johnson v. Commonwealth, 273 Va. 315, 323-24, 641 S.E.2d 480, 484-85 (2007), and Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006) for this statement. In Johnson, as discussed infra, the ultimate issue upon which Johnson’s "actual innocence” hung was whether a key trial witness had lied at trial, or had lied in his subsequent recantation. Were the witness telling the truth when he recanted his trial testimony, then there would be no evidence linking Johnson with the crime of which he was convicted. Hence, in that context, it was appropriate—if confusing—to use the terms "truth” and "credibility” interchangeably. And while the term "credible evidence” means "[e]vidence that is worthy of belief; trustworthy evidence,” Black’s Law Dictionary 637 (9th ed.2004), it does not logically follow that all of the "believable" evidence is of necessity true. If that were the case, the English language would not require two different words for the concepts of “credibility” and "truth.”
Molina stands for the proposition that we must, on appellate review, " 'regard as true all the credible evidence favorable to [the party who prevailed below.]’ ” 272 Va. at 671, 636 S.E.2d at 473 (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphases added)). This principle is inapplicable in this case for two reasons. First, as explained above, this case does not involve an appellate review. The Court of Appeals is the court of original jurisdiction for cases involving the writ of actual innocence based on non-biological evidence. Second, the prevailing party in this case was the Commonwealth— Turner comes to us as a person convicted of a brutal murder by a jury of his peers. We owe Turner’s proffered evidence not one bit of deference.
In fact, credibility often has nothing to do with the truth. Credible simply means "believable.” Bryan A. Garner, A Dictionary of Modem Ilegal Usage, 235 (2d ed.1995). As we now know, innocent individuals have been convicted based on entirely credible, but wrong, testimony. In 1982, Arthur Lee Whitfield was convicted of two rapes based on the highly credible testimony of the two victims, both of whom positively identified Whitfield as their attacker. In 2004, DNA evidence exonerated Whitfield of both crimes and identified a convicted rapist as the actual assailant. Whitfield was subsequently pardoned by the governor in 2009. See Rep. to the Gen. Assemb., "List of Pardons, Reprieves, and Other Forms of Clemency,” Sen. Doc. No. 2 (2010); see also In re: Arthur Lee Whitfield, Rec. Nos. 042086 & 042087 (Va. Oct. 21, 2005).

. Both the majority and dissent refer to Brown’s affidavit as a "recantation.” I reject that characterization. While he may have recanted the statements he gave to the police and his testimony at this own trial, Brown did not testify at Turner’s trial and, thus, there was no testimony in this proceeding for him to recant. Unlike Carpitcher and Johnson, Turner was not convicted based solely on testimony that the witness later claimed was false. In the context of the matter before us, Brown’s new version of the events of that fatal night should be analyzed the same way trial courts deal with the garden-variety after-discovered alibi witness testimony that prompts motions for new trials on a daily basis.

. Although it is axiomatic, it seems worth repeating that "[cjircumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, ... it is practically the only method of proof.” Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis in the original) (citing Turner v. Commonwealth, 218 Va. 141, 145-46, 235 S.E.2d 357, 360 (1977); Toler v. Commonwealth, 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949)).

. The majority suggests that this "mistakenly ignores the fact that the circuit court ... became the fact finder, i.e., the hypothetical juror” and a "substitute for the original trial jury.” Supra at 416 n. 12, 694 S.E.2d at 264 n. 12. This statement is irrelevant to my analysis that we can decide this case without resort to further factual findings. However, I do reject the notion that either our jurisprudence or our General Assembly would sanction the idea that a circuit court could substitute its factual findings for those of the jury whose findings both this Court and the Supreme Court have affirmed.