UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Raphael
Argued by videoconference

CLEVESTER ANTOINE LUCAS

MEMORANDUM OPINION* BY
v.      Record No. 1946-22-1          JUDGE RANDOLPH A. BEALES
MARCH 5, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Tanya Bullock, Judge

Trevor Jared Robinson for appellant.

Suzanne Seidel Richmond, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

On March 28, 2022, following a bench trial, the trial court found Clevester Antoine Lucas

guilty of the following offenses: one count of burglary of a bank while armed, two counts of

robbery, one count of possession of a firearm by a violent felon, one count of wearing a mask in

public, one count of eluding police, and two counts of use of a firearm in the commission of a

felony. On appeal, Lucas challenges the trial court's denial of his renewed motion to strike, arguing

that "the evidence was insufficient for a finding of guilt beyond a reasonable doubt" for all of his

convictions.

I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

(2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

On July 11, 2018, at 1:42 p.m., a black male entered the Wells Fargo Bank located at 699 Independence Boulevard in Virginia Beach, pointed a gun at the bank tellers, and demanded money. Kathy Dougherty, the bank's branch manager, testified at trial that she saw the suspect standing at the teller counter and demanding the money in the teller drawers. Dougherty described the suspect as wearing "dark brown Dickie pants, a plaid shirt. He had a bucket hat on and a -- either a Navy blue and white bandana across his face." Dougherty recalled that the suspect was approximately six feet two inches tall and was wearing gloves on both of his hands.

Vivianna Rivas, one of the bank tellers on duty that day, testified that the suspect "walked up to my teller line still pointing the gun at me, threatened my life saying if I call the police, give him any trackers, or activated any silent sensors that he would come back and kill me." Rivas described the suspect as "wearing a plaid shirt, a plaid -- kind of blue and yellow plaid shirt fully covered, bucket hat, bandana." Tonya Hooks, the drive-through bank teller on duty that day, similarly testified that the suspect "entered the building with a gun raised up" and that he told "the ladies on the side to move away from their stations, and then he proceeded to come up to us [Rivas and Hooks] and asked us to hand him the money."

Rivas recounted that "while he was still pointing the gun at me, I gave him my top drawer of cash," as well as "the strapped cash, which is the second drawer." The money from Rivas's teller station totaled approximately $4,000 and contained a hidden GPS tracking device. The suspect also demanded that Hooks bring over money from her drive-through teller station. Seeing that the suspect was armed, Hooks took approximately $3,000, which contained a second

hidden GPS tracking device, from her drawer and moved it to Rivas's teller station.  Following the armed suspect's instructions, Rivas put the money in the suspect's "white Lidl bag."  The suspect then fled the Wells Fargo Bank on foot toward Pembroke Boulevard with the money and two hidden GPS tracking devices, and Rivas activated the bank's silent alarm.  Dougherty noted that the suspect was holding a firearm with his right hand as he fled the bank on foot while carrying a "white plastic bag" with "[b]lue writing."  Dougherty later determined that the suspect stole approximately "$7,385 and $160 in the track pack," and she clarified that the "track pack" referred to the money containing the hidden GPS tracking devices.

As the suspect fled the Wells Fargo Bank with the stolen money, the hidden tracking devices automatically activated and began sending out GPS signals to establish a positional location.  Philip Johnakin, a regional representative of the company that supplied the hidden GPS tracking devices to the bank, testified that the tracking devices provide an estimated location based on GPS signals and create data points on a spreadsheet that show the location and movements of the tracking devices over time.  Examining the spreadsheet generated from the tracking device data, Johnakin noted that the "first specific location is at 1343 and 47 seconds [1:43 p.m.], and it's 4633 Pembroke Lake Circle, Virginia Beach, Virginia," which is next to the Wells Fargo Bank.

Sergeant Mark Laino, the supervisor of the Virginia Beach Police Department's Robbery Squad, testified that after receiving an activation alarm from the tracking device company for the Wells Fargo Bank on the date of the robbery, "I immediately logged onto the 3SI GPS tracking system, and I saw that the device had started moving."  Watching the tracking device movements on his cell phone in real time, Sergeant Laino then made a robbery-in-progress call to the police dispatcher and began relaying the tracking device movements to nearby patrol officers over the police radio.  Sergeant Laino determined by the speed of the tracking device movements that the

suspect was initially traveling on foot before starting to move in a vehicle. Sergeant Laino provided the patrol officers with the specific movements of the suspect, and the officers informed him that the movements matched those of a "white vehicle" that they had begun pursuing.

Several other Virginia Beach police officers who were involved in the pursuit, arrest, and investigation of the suspect also testified at trial about the incident. Officer Jorwell Macapobre testified that he responded to Sergeant Laino's bank robbery dispatch and began following a "white Toyota Corolla displaying tags EFN6051 North Carolina." Officer Macapobre — who identified Lucas as the driver of the white Toyota Corolla — followed the car into a Best Buy parking lot and activated his vehicle's emergency equipment. Officer Macapobre recalled:

> He [Lucas] started to exit the vehicle. That's when I exited my vehicle. I drew my weapon in the low ready and started giving him commands. That's when the assist units arrived on scene. At the time I instructed him multiple times to stay in the vehicle and to keep his hands visible. He did not comply, and he lowered his hands. He then partially proceeded to exit the vehicle again. I instructed him to enter his vehicle, which he did. And then he started to drive away at a high rate of speed towards the direction of the Exxon and Euclid Road from the Best Buy parking lot. I entered my vehicle. I proceeded to follow him. That's when the white Toyota Corolla made a left going -- traveling northbound on Independence Boulevard from Euclid Road at a high rate of speed.

Lucas then crashed his car into "a red Ford Mustang and a silver Lexus" at "the intersection of Virginia Beach Boulevard and Independence Boulevard." Suzanne Brazier, the driver of the red Ford Mustang, testified that while she sat in her car "at a red light waiting for that light to turn," she "was hit from behind. And then I witnessed the car hit the car in front of me and come to a stop." Brazier stated, "I saw a gentleman exit the vehicle that had struck me, and he had a bag and a weapon in his hand. He tucked the weapon like in his back waistband and then started to run away." Officer Macapobre noted that "pedestrians and civilians were waving me down pointing me to where the driver of the white Toyota Corolla was running to."

Detective Jason Atwood testified that "both city cameras and red light cameras" captured Lucas's car crash, his attempts to flee from police, and his subsequent arrest. The cameras showed that Lucas struck two other vehicles before exiting his vehicle and running across Independence Boulevard "toward the shopping center carrying what appears to be, according to the video, a bag, dropping a hat in the crosswalk -- or what appears to be an article of clothing." Lucas "was clutching a duffel bag" as he ran down Virginia Beach Boulevard before officers apprehended him following a struggle. Detective Atwood noted that a firearm was recovered near the site of Lucas's arrest.

Officer Brian Grimes testified that after taking part in the vehicle pursuit, he secured a "blue duffel bag" from Lucas as Lucas was apprehended by other officers. Officer Grimes recalled that there "appeared to be like a grocery bag, and then there was some loose cash and some bundled cash" in the duffel bag. Officer Brian Floyd was also part of the vehicle pursuit and testified that after the car crash, he "observed a black male running across the street away from officers" and "observed a black handgun fall from the male running from the officers." Officer Andrew Tibbetts, who assisted in Lucas's arrest, likewise observed the handgun fall from Lucas's person onto the roadway, and he retrieved the handgun before securing it in his patrol vehicle. Officer Trey Maupin also assisted in Lucas's arrest and stated that it took several officers to apprehend Lucas and wrestle the blue duffel bag away from him.

Following Lucas's arrest, Megan Gravina of the Virginia Beach Police Department's Forensics Services Unit went to the site of Lucas's arrest to take photographs and take inventory of the evidence. Gravina testified that $7,380, plus the $160 containing the hidden GPS tracking devices, was recovered from the blue duffel bag, as well as a "plastic Lidl bag," a "long sleeve plaid shirt," a "black floppy hat," and a "blue and white bandana." Gravina noted that a "Ruger

Security 9 handgun" was also recovered near the site of Lucas's arrest, as well as a handgun magazine containing 15 cartridges.

Kimberly Freeman, a forensic scientist with the Virginia Department of Forensic Science, testified that she conducted a DNA analysis of the recovered items and determined that "Clevester Lucas cannot be eliminated as a major contributor" of the DNA on the plaid long sleeve shirt and the black floppy hat. For those two items, Freeman concluded that "the probability of randomly selecting an unrelated individual with the DNA profile matching the major profile developed in a sample collected . . . is one in greater than 7.2 billion."

At trial, counsel for Lucas moved to strike the Commonwealth's evidence, and later renewed his motion to strike. Lucas did not testify or present evidence at trial. The trial court denied both motions to strike and found Lucas guilty beyond a reasonable doubt on all of the charges. Lucas now appeals to this Court.

## II. ANALYSIS

Lucas argues on appeal to this Court, "The trial court erred in denying Appellant's renewed motion to strike, as the Commonwealth's evidence was insufficient for a finding of guilt beyond a reasonable doubt." Assigning error to all of his convictions, Lucas argues on brief that "the evidence against him at trial was merely circumstantial" and contends that there was a "lack of any physical evidence or identification of the Appellant at the Wells Fargo bank."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant

question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). The Supreme Court has stated, "There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005). The Supreme Court has further noted, "Circumstantial evidence is not viewed in isolation. While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Id.* (citing *Commonwealth v. Hudson*, 265 Va. 505, 514, *cert. denied*, 540 U.S. 972 (2003)).

In this case, the Commonwealth put on an overwhelming amount of evidence to prove Lucas's guilt for each of the charged offenses. At trial, three Wells Fargo Bank employees who witnessed the bank robbery described the suspect's appearance and clothing items, which matched the clothing items found in the blue duffel bag that police recovered from Lucas following his arrest. The bank employees also noted the suspect's black handgun and white plastic grocery bag, which likewise matched the black handgun and white plastic grocery bag recovered by police at the site of Lucas's arrest. The bank employees further noted the amount of money stolen from the bank and the GPS tracking devices that were concealed in that money, which matched the stolen money and hidden GPS tracking devices recovered from Lucas at his arrest.

In addition, a still photograph that was taken from the Wells Fargo Bank's security camera video footage during the robbery showed the suspect directing Rivas, one of the bank tellers, to put the money from her drawer in the white Lidl bag. The suspect in the photograph was a black male holding a black handgun and wearing a long sleeve plaid shirt, a blue and white

bandana that partially covered his face, and a black floppy hat, which again matched the description of the suspect by the bank employees — and also matched the clothing items found in Lucas's blue duffel bag when he was stopped. Forensic evidence later showed — and Lucas concedes on appeal — that Lucas was a major contributor of the DNA found on both the plaid long sleeve shirt and the black floppy hat.

Furthermore, several Virginia Beach police officers testified at trial about their involvement in the pursuit, arrest, and investigation of Lucas following the bank robbery. Sergeant Laino recalled that he received a notification on his cell phone from the company that supplied the tracking devices to the Wells Fargo Bank that the hidden GPS tracking devices from the bank had been activated, and he followed their movements in real time. Sergeant Laino tracked those specific movements from the time just after the bank robbery to the moment Lucas was apprehended by police with the stolen money and tracking devices in his possession. Sergeant Laino also relayed those detailed movements to other police officers patrolling the nearby area, who were then able to match those movements to a white Toyota Corolla with a North Carolina license plate.

Officer Macapobre began following the white Toyota Corolla, activated his vehicle's emergency equipment, and attempted to confront Lucas — who was driving the vehicle — in the Best Buy parking lot before Lucas fled at a high rate of speed and soon thereafter crashed into two other cars at a busy intersection. Officer Tibbetts witnessed the car crash and saw Lucas clenching a duffel bag after getting out of his vehicle and running away on foot. Red-light cameras near the intersection of Independence Boulevard and Virginia Beach Boulevard also captured the car crash and showed Lucas darting through traffic away from police while carrying the duffel bag. Officer Tibbetts and Officer Floyd testified that they saw the handgun fall from Lucas's person onto the roadway as he fled from police, and Officer Tibbetts retrieved the

firearm and secured it in his patrol vehicle. Officer Maupin and other officers physically apprehended Lucas and wrestled the blue duffel bag away from him during his arrest. Officer Grimes then secured the blue duffel bag, which contained the grocery bag and the stolen money with hidden GPS tracking devices from the Wells Fargo Bank — within less than an hour after the bank was robbed.

Given all of the testimony, forensic results, photographs, and other evidence described *supra*, we certainly cannot say that no rational factfinder could have found the evidence sufficient for Lucas's burglary of a bank conviction, robbery convictions, wearing a mask in public conviction, and firearm convictions. Lucas entered the Wells Fargo Bank on July 11, 2018 while carrying a firearm, and he conceded at trial that he was a convicted felon on that date. Lucas also partially concealed his face with a bandana and floppy hat, and he demanded that the bank tellers hand over the money from their stations while he made threats and pointed a handgun in their direction.

In addition, once Lucas's white grocery bag was filled with thousands of dollars in cash — and, unbeknownst to him, two hidden GPS tracking devices — he fled from the bank. Police were then able to track Lucas and attempted to confront him in the Best Buy parking lot, but he accelerated his white Toyota Corolla away at a high rate of speed. Even after crashing his car at a busy intersection, Lucas continued to flee from police on foot until he was apprehended when pursuing officers wrestled him to the ground as he tried to escape. Lucas's affirmative acts of flight immediately following the bank robbery established his consciousness of guilt. *See Jones v. Commonwealth*, 279 Va. 52, 58 (2010) ("Such acts of flight from a crime scene, or of deceitful behavior immediately following the commission of a crime, are acts that generally cannot be explained in terms of innocent human behavior. Thus, when a defendant affirmatively acts in such a manner, a court may consider those acts in the context of all the facts presented as

evidence tending to show the defendant's consciousness of guilt of the crime committed."). Consequently, given the testimony of the officers along with all of the other evidence here, we also certainly cannot say that no rational factfinder could have found the evidence sufficient for Lucas's conviction for eluding police.

### III. CONCLUSION

In short, the overwhelming evidence here was more than sufficient for a rational factfinder to conclude that Lucas committed the bank robbery on July 11, 2018. Three Wells Fargo Bank employees who witnessed the robbery described the suspect's appearance and clothing and noted that he had a firearm and a white plastic bag, which matched the specific items recovered from the blue duffel bag and the road near the site of Lucas's arrest. The police tracked Lucas in real time following the bank robbery as Lucas fled from police, and several officers identified Lucas in court as the bank robbery suspect that they had pursued and apprehended. In addition, Lucas was a major contributor of the DNA on the plaid long sleeve shirt and the black floppy hat that were described by bank employees as having been worn by the man who robbed them — and that were found in the blue duffel bag with Lucas. Furthermore, Lucas also conceded at trial that he was a convicted felon on the date of the bank robbery. For all of these reasons, we affirm the judgment of the trial court and uphold each of Lucas's convictions.

*Affirmed.*